ESTATE OF AL J. SCHNEIDER, DONALD J. SCHNEIDER, ET AL., PERSONAL REPRESENTATIVES, AND AGNES SCHNEIDER, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6234-79.　　　Filed April 15, 1987.

*Robert E. Nelson* and *Arthur Kaftan*, for the petitioners.
*Edward J. Roepsch*, for the respondent.

CHABOT, *Judge*: Respondent determined deficiencies in Federal individual income tax against Al J. Schneider and Agnes Schneider for 1975 and 1976 in the amounts of $17,745.84 and $21,415, respectively. After concessions by both sides, the issues for decision are as follows:

(1) Whether certain dispositions of stock by Al J. Schneider constitute (a) sales of stock by him to employees or (b) redemptions of the stock from him.

(2) If the dispositions are redemptions, then whether the redemptions are essentially equivalent to dividends.

(3) Alternatively, whether the dispositions are taxable under section 83.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioners Al J. Schneider (hereinafter sometimes referred to as Al) and Agnes Schneider (hereinafter sometimes referred to as Agnes), husband and wife, resided in Green Bay, Wisconsin. After the trial of this case, Al died and his estate was substituted as a petitioner. Al and Agnes were cash basis taxpayers; they filed their Federal individual income tax returns on a calendar year basis.

### *Organization of the Schneider Companies*

Schneider Transport, Inc. (hereinafter sometimes referred to as Transport), formerly Schneider Transport & Storage,

---

[1]Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue.

Inc., a Wisconsin corporation founded by Al in 1938, was engaged in interstate freight transport. During 1975 and 1976, Transport was part of a group of affiliated corporations that included Transport's parent corporation, American National Corp. (hereinafter sometimes referred to as ANC)[2] and ANC's successor, AMNACO, Inc. (hereinafter sometimes referred to as AMNACO), subsidiary corporations, and several other closely held corporations which owned the real estate used by the affiliated corporations, rented trucks, distributed tractor and trailer parts, or engaged in other activities related to the business of common carriage by truck.[3] For the period 1971 through 1976, the affiliated corporations filed their tax returns for the calendar year, using the accrual method of accounting.

As of December 1, 1971, Transport had an initial authorized capital of 2,000 shares, $25 par value, Class A voting common stock and 6,000 shares, $25 par value, Class B nonvoting common stock; the 4,578 shares of the two classes of stock issued and outstanding were held as follows:

|  | Class A | Class B |
|---|---|---|
| Al[4] | 1,007 | 1,921 |
| Agnes | - - - | 30 |
| Don | 520 | 220 |
| Paul C. Schneider | - - - | 220 |
| James L. Schneider | - - - | 220 |
| John Schneider | - - - | 220 |
| Agnes, as custodian for Kathleen Schneider | - - - | 220 |
|  | 1,527 | 3,051 |

[2]ANC was incorporated on Mar. 2, 1973, as a holding company for the affiliated corporations. See discussion *infra.*

[3]Trans-National Truck, Inc. (hereinafter sometimes referred to as TNT), which was wholly-owned by Donald J. Schneider (hereinafter sometimes referred to as Don), Al's and Agnes' son, did not become a subsidiary of AMNACO until after 1978. See discussion *infra* at note 6, of the AMNACO/TNT reorganization.

[4]The relationships to Al of some of the shareholders of Transport and the affiliated corporations are as follows:

Wife:               Agnes
Children:        Don (wife—Patricia)
                      James L. Schneider
                      John Schneider
                      Kathleen Schneider
                      Paul C. Schneider (hereinafter sometimes referred to as Paul) (wife—Brenda)
                      David Schneider

During 1971, Al was the president, chairman of the board of directors, and principal shareholder of Transport; Agnes was a director and vice president; and Don was a director and the secretary. Paul Gustafson, an individual unrelated to the Schneider family, was the treasurer of Transport.

In December 1971, Transport's authorized capital was changed to 100,000 shares, $0.50 par value, Class A voting common stock and 300,000 shares, $0.50 par value, Class B nonvoting common stock and the foregoing shareholders' stock was split on a 50-to-1 basis.

On March 2, 1973, ANC was formed to be the parent corporation of Transport and most of the affiliated corporations. On December 5, 1973, ANC adopted an amendment to its articles of incorporation which gave ANC an authorized capital of 500,000 shares, $0.10 par value, Class A voting common stock and 1,500,000 shares, $0.10 par value, Class B nonvoting common stock. In January 1974, the shareholders of Transport received 5 shares of the same class of ANC stock in exchange for each share of Transport stock held. Thereafter, ANC's 1,159,440 outstanding shares of common stock were held as shown in table 1 below.

## TABLE 1

| | Number of A shares | Percentage of A shares | Number of B shares | Percentage of B shares | Percentage of total shares |
|---|---|---|---|---|---|
| Al | 251,750 | 65.95 | 283,355 | 36.44 | 46.15 |
| Relatives:[5] | | | | | |
| Agnes | --- | --- | 7,500 | .97 | .65 |

| Grandchildren: | | |
|---|---|---|
| | Kathleen M. Schneider | |
| | Thomas J. Schneider | |
| | Paul Schneider | Children of Don |
| | Terry A. Schneider | |
| | Mary P. Schneider | |
| | Brandt P. Schneider | |
| | Gwen L. Schneider | |
| | Jill M. Schneider | Children of Paul |
| | Elizabeth A. Schneider | |
| | Jennifer E. Schneider | |

[5]The parties have stipulated as to the names of Al's relevant relatives. Many of the exhibits show shareholders with names almost the same as these relatives (e.g., "Brant" rather than "Brandt", "Gwyn" rather than "Gwen"). We assume that the people named in the exhibits are the same as the people named in the stipulation, and we adhere to the spelling found in the stipulation.

| | Number of A shares | Percentage of A shares | Number of B shares | Percentage of B shares | Percentage of total shares |
|---|---|---|---|---|---|
| Don | 130,000 | 34.05 | 94,985 | 12.22 | 19.40 |
| Paul | - - - | - - - | 89,300 | 11.48 | 7.70 |
| James L. Schneider | - - - | - - - | 87,105 | 11.20 | 7.51 |
| John Schneider | - - - | - - - | 87,105 | 11.20 | 7.51 |
| Kathleen Schneider | - - - | - - - | 87,105 | 11.20 | 7.51 |
| Brandt P. Schneider | - - - | - - - | 3,890 | .50 | .34 |
| Gwen L. Schneider | - - - | - - - | 3,890 | .50 | .34 |
| Jill M. Schneider | - - - | - - - | 3,890 | .50 | .34 |
| Elizabeth A. Schneider | - - - | - - - | 3,890 | .50 | .34 |
| Jennifer E. Schneider | - - - | - - - | 1,750 | .22 | .15 |
| Mary P. Schneider | - - - | - - - | 3,890 | .50 | .34 |
| Terry A. Schneider | - - - | - - - | 3,890 | .50 | .34 |
| Thomas J. Schneider | - - - | - - - | 3,890 | .50 | .34 |
| Kathleen M. Schneider | - - - | - - - | 3,890 | .50 | .34 |
| Brenda Schneider | - - - | - - - | 1,750 | .22 | .15 |
| Patricia Schneider | - - - | - - - | 1,750 | .22 | .15 |
| Al plus relatives | 381,750 | 100.00 | 772,825 | 99.37 | 99.60 |
| *Nonrelatives:* | | | | | |
| Paul Gustafson | - - - | - - - | 390 | .05 | .03 |
| Pat Fleming | - - - | - - - | 410 | .05 | .03 |
| Don Martin | - - - | - - - | 3,140 | .41 | .27 |
| Warren Taylor | - - - | - - - | 175 | .02 | .01 |
| Bill Ryan | - - - | - - - | 750 | .10 | .06 |
| Totals | 381,750 | 100.00 | 777,690 | 100.00 | 100.00 |

Pursuant to a plan of reorganization, effective December 24, 1976, the ANC shareholders exchanged their Class A and Class B stock for an equal number of Class A and Class B stock of AMNACO, a new holding company incorporated under Nevada law. AMNACO became the successor corporation to ANC. AMNACO had a total authorized capital stock of 2 million shares, consisting of 500,000 shares, $0.10 par value, Class A voting common stock and 1,500,000 shares, $0.10 par value, Class B nonvoting common stock. Al was the chairman of the board of directors and the principal stockholder of AMNACO.

On June 28, 1978, AMNACO's articles of incorporation were amended to authorize, among other things, the issuance of 150,000 Class B nonvoting common shares to employees, as follows:

4. *Stock for Employees*. The boards of directors of this Corporation and its subsidiaries are authorized to issue up to 150,000 shares of Class B common stock of this Corporation (10% of the authorized number of Class B shares) to such employees of [ANC] and its subsidiaries as such boards of directors may select. Such Class B shares may be issued solely for services rendered or to be rendered, or sold for such consideration as the respective directors may determine, including a price other than market. No stockholder shall have an [sic] preemptive right over the Class B shares issued hereunder.

With the exception of the payments to Al in issue in the instant case, no cash dividends were ever paid to any shareholder of Transport, ANC, or AMNACO during the period 1971 through 1980.

### The Stock Bonus Plans

Before 1971, Transport and the affiliated corporations paid their key employees cash bonuses only. There was no plan that would enable key employees to receive stock in Transport.[6] Business had grown significantly in the late 1960's and in 1970, and Don and other managers decided that implementing a stock plan would enable Transport to compete with other organizations in attracting and retaining management personnel. Don suggested to Al that Transport adopt a plan to make stock available to key employees. Thus, on December 30, 1971, Transport adopted a nonqualified employee stock purchase plan (hereinafter

---

[6]In 1968, Transport gave Don a 10-year option to buy 20,000 shares of Transport Class A voting common stock at $4 per share, the then book value of the stock. The option originally was to expire in July 1978, but was later extended until the AMNACO/TNT reorganization described below was approved by the Interstate Commerce Commission. In January 1974, the Transport shareholders exchanged their stock on a 5-to-1 basis for ANC stock. Consequently, Don's option became one to buy 100,000 shares of ANC stock (and subsequently, shares of AMNACO) at $0.80 per share. Don was granted the option because of his management performance; that is, Transport's officers attributed much of the growth the organization had experienced to Don's arrival there and they wanted to encourage him to stay with the company. No other employees of the affiliated corporations were granted stock options at that time.

From 1971 until after 1978, Don was the sole shareholder of TNT. Because Al and Don wanted TNT to become a subsidiary of AMNACO, on June 28, 1978, AMNACO adopted a plan of reorganization and recapitalization to exchange 100,000 shares of AMNACO Class A voting common stock and 19,231 shares of AMNACO Class B nonvoting common stock for all the outstanding TNT shares held by Don. The number of AMNACO shares that Don was to receive for his TNT shares was calculated by dividing the sum of TNT's book value and goodwill value by the then book value of the AMNACO stock. In addition, Don agreed to cancel his option to buy AMNACO stock. Thus, this option was never exercised. Don did not exercise the option before the AMNACO/TNT reorganization because he did not want to lay out so much cash and did not want to pay the resulting income tax.

sometimes referred to as the Transport Plan), which provided as follows:

### Schneider Transport Stock Bonus Plan

1. *Purpose of the Plan.* This Stock Bonus Plan, hereinafter called the "Plan" is designed to reward key employees of Schneider Transport, Inc., hereinafter called the Corporation, and also employees of its subsidiary or affiliated corporations, for past performances; to encourage them and other employees to greater efforts in the future; and to give them an equity interest in the business so that they may identify themselves closer with its success or failure.

2. *Bonuses.* Before the end of each year, beginning in 1971, the Board of Directors of the Corporation shall determine the total amount to be given out in bonuses under this Plan. The President of the Corporation shall then choose the employees who shall receive such bonuses and the cash amount for each, based on the performance of that employee, the results of the area of work under his control, his potentiality, and such other factors as the Directors deem relevant.

3. *Withholding.* From each cash bonus the Directors shall specify the amount of U.S. and State income taxes to be withheld. The employee by accepting the bonus consents to such withholding.

4. *Option To Take Stock Or Cash.* Each employee shall have 10 days after being informed of the amount of the bonus to decide whether he wishes the net bonus, after the withholding of income taxes, to be paid to him in cash or in stock of the Corporation at the Current Formula Price.

5. *Current Formula Price.* The Current Formula Price shall be the book value of the Corporation at the end of the year for which such bonus is being paid, plus the excess of the book value of the Corporation's 100% owned subsidiaries over the investment in such subsidiaries carried on the Corporation's books, divided by the total number of shares of Class A and Class B shares outstanding at the end of such year.

All amounts shall be book figures as maintained for Interstate Commerce Commission accounting purposes and the determination made by the Board of Directors shall be binding and conclusive.

6. *Restrictions On Stock.* All stock acquired by an employee under this Plan shall be subject to the following restrictions on transferability:

A. *Retirement or Termination of Employment.* If an employee retires, quits or is discharged at any time, the Corporation shall have the option to purchase all or any part of his shares from him at the percentage of the Current Formula Price which follows:

| If employee retires, quits or is discharged after receiving the stock within | The price to be paid the employee shall be |
|---|---|
| One year | 10% of Current Formula Price |
| Two years | 20% of Current Formula Price |
| Three years | 30% of Current Formula Price |
| Four years | 40% of Current Formula Price |
| Five years | 50% of Current Formula Price |

| *If employee retires, quits or is discharged after receiving the stock within* | *The price to be paid the employee shall be* |
|---|---|
| Six years | 60% of Current Formula Price |
| Seven years | 70% of Current Formula Price |
| Eight years | 80% of Current Formula Price |
| Nine years | 90% of Current Formula Price |
| Ten years and thereafter | Current Formula Price |

The Current Formula Price shall be the Current Formula Price at the end of the year preceeding [sic] such event.

B. *Sale During Employee's Lifetime.* If any employee wishes to sell all or any part of the stock he acquires hereunder, he shall first offer in writing such stock to the Corporation at the applicable percentage of the Current Formula Price shown in the above table in subparagraph A. If the Corporation shall not accept such offer in writing within the next 30 days, then the employee may sell to any person at any price and on any terms.

C. *Death of Employee.* On the death of any employee who acquires stock hereunder, the Corporation shall have the option for 90 days after the appointment of a personal representative of the deceased employee to purchase all or any part of his stock at the Current Formula Price at the end of the prior year.

D. *Gifts.* No gift of the stock acquired hereunder may be made by an employee.

E. *Encumbrance.* No stock acquired hereunder may be encumbered in any way without the written consent of the Corporation.

7. *Notice On Certificate.* All stock certificates issued for stock given hereunder shall bear a notice of the restrictions on transferability contained in this Plan.

8. *Election Under Section 83(b) of Internal Revenue Code.* For each taxable year that an employee receives stock hereunder he shall execute and file with the Internal Revenue Service an election to report the Current Formula Price of the stock in the year to which the bonus is applicable. Such election shall be in such form as the Directors may prescribe.

9. *Administration of Plan.* The Board of Directors of the Corporation shall administer the Plan, interpret its provisions, prescribe, amend, and rescind provisions of it or interpretation of it.

The Plan may be discontinued at any time. Nothing herein shall give any employee any claim to a bonus. The employees to be given bonuses and the amounts thereof shall be at all times entirely in the discretion of the Board of Directors.

Don suggested the Transport Plan provisions (par. 6) that permitted an employee to receive, on retirement or termination of employment, an amount equal to 10 percent per year

of the Current Formula Price if Transport chose to purchase the employee's shares (hereinafter sometimes referred to as the 10-percent vesting provision). It was believed that the 10-percent vesting povision would provide an incentive for employees to remain with the Transport affiliated group after having decided to invest therein. Although some of the employees would have preferred not to be subject to the 10-percent vesting provision, they believed that this provision would encourage the management team to remain together and enjoy some of the appreciation in value the company was experiencing. Moreover, the employees that acquired stock believed that, in spite of the 10-percent vesting provision, they would reach the break-even point within 3 to 5 years with respect to the stock received under the Transport Plan (and, later, the ANC Plan, described *infra*), if one considered the rapid increase in the book value of the stock.

The Transport Plan governed the authorization of bonuses by Transport in 1971 and 1972 with respect to stock that was to be transferred to employees in 1972 and 1973, respectively.

Because ANC was formed in 1973 to act as a holding company for Transport and the affiliated corporations, it was determined that the Transport Plan should be adopted by ANC on January 1, 1974, at the time of the exchange of ANC stock with the Transport shareholders. Thus, the minutes of a special meeting of the ANC shareholders held January 1, 1974, include the following:

> [Don] called the meeting to order and stated that the purpose was to adopt a stock ownership plan for employees of [ANC] and employees of all its subsidiary and affiliated corporations. This plan is a continuation of the [Transport Plan] * * * . The exchange of [ANC] stock for * * * Transport stock requires that the plan be shifted to [ANC].
>
> Transport and other subsidiary and affiliated corporations of [ANC] will authorize certain dollar amounts of additional compensation for certain of their employees. Each employee will have 10 (ten) days to determine whether he wishes to take cash or stock of [ANC]. If he takes any stock, he may not take less than 25% of the dollar amount allocated to him. As to those employees who choose stock, Transport, or the other subsidiary and affiliated corporations, will either give the employee the cash with which he may buy [ANC] stock from [Al], or will transfer to [ANC] the cash to buy newly-issued shares from [ANC].

[Don] stated that the plan was essentially the same as Transport's with a few amendments. After some further discussion, it was moved, seconded and unanimously

RESOLVED: [ANC] adopt the American National Employee Stock Ownership Plan [hereinafter sometimes referred to as the "ANC Plan"], a copy of which is attached to these minutes and made a part hereof.

FURTHER RESOLVED: Each employee who is receiving any part of his 1973 additional compensation in stock shall at the time of receiving such stock sign an Undertaking and Agreement that he will abide by all the terms of this Plan and that such Agreement shall cover all the stock which he is receiving or will receive in the future under the [ANC Plan].

Such Agreement shall also specifically permit the Board of Directors of [ANC] to amend and interpret the [ANC Plan] and require such employee to abide by all such amendments and interpretations.

Each employee who has received stock of [Transport] for 1971 and 1972 as additional compensation, which stock is being exchanged for [ANC] stock, shall sign an Undertaking and Agreement that he and such stock are subject to all the provisions and obligations of the previous [Transport Plan] and shall recognize that [ANC] succeeds to all the rights and obligations of [Transport] under such [Transport Plan].

The President and the Secretary of [ANC] are authorized to issue certificates for such number of Class B shares from time to time as may be necessary to implement this [ANC Plan].

Like the Transport Plan, the ANC Plan was a nonqualified employee stock purchase plan.

The ANC Plan, as adopted in 1974, amends the Transport Plan in several respects: (1) It provides for the issuance of restricted ANC Class B nonvoting common stock to implement the ANC Plan; (2) it provides a formula for determining a participant's share of the total bonus; (3) it requires that any employee who elected to receive part of his or her bonus in stock take at least 25 percent of the gross amount allocated to him in stock; and (4) it eliminates the requirement in the Transport Plan that any employee receiving stock under the ANC Plan execute and file with the Internal Revenue Service an election under section 83(b) (hereinafter sometimes referred to as a sec. 83(b) election).

On March 12, 1974, ANC's board of directors amended the ANC Plan with regard to the source of the Class B stock that would be provided under the ANC Plan for 1973. The minutes of the board of directors' meeting include the following:

At present, [ANC] is functioning only as a holding company. If newly issued stock of [ANC] is to be used to provide the shares necessary under

the [ANC Plan], Transport would have to pay the cash into [ANC] for the shares to be issued. [ANC] would then have little use for this cash and would probably either have to lend it back to Transport or contribute it to Transport capital.

A simpler method is to merely give the employee the cash and let him buy the stock from [Al]. [Al] stated that he was willing to accommodate the [ANC] Plan in this manner, at least this year. [Don] stated that it had always been the intention that any source could be used for stock and felt that perhaps the [ANC] Plan should be revised slightly to specifically reflect this. After discussion, it was moved, seconded and unanimously

RESOLVED: The [ANC] Plan be revised as follows:

Paragraph 4. "Option to Take Stock or Cash" shall be amended to read as follows:

"4. *Option to Take Stock or Cash.* Each employee shall have ten (10) days after being informed of the dollar value allocated to him to decide whether he wishes the net amount, after the withholding of taxes, to be paid to him all in cash or whether he wishes to buy Class B stock of [ANC] at the Current Formula Price for all or part of the amount. If he elects to take part stock, he may not take less than 25% of the gross amount allocated to him."

A new paragraph 10 shall be added as follows:

"10. *Source of Stock.* The Class B stock to be purchased hereunder may be either stock presently owned by any Class B stockholder or group of stockholders, or unissued stock of [ANC], at the discretion of the Board of Directors." * * * [7]

The ANC board of directors further amended the ANC Plan on January 5, 1976, (1) to define more specifically the phrase "gross amount", as that term is used in paragraph 4 of the ANC Plan, and (2) to amend the 10-percent vesting provision so as not to apply to employees after they reach age 55. Thus, the minutes from that meeting reflect the following amendments:

---

[7]It was Don's idea that Al's shares be sold to employees under the ANC Plan. His reasons for utilizing Al's stock were as follows: (1) Don believed that ANC was a holding company and had no need for the cash it would receive from the employees when they purchased stock under the stock plan; (2) Don believed that there would be less dilution of ANC's earnings and profits because the corporation would not be issuing new shares; thus, the shares outstanding would appreciate faster and would be a more attractive investment; and (3) Don wanted to see key management people own a majority of the shares in the corporation.

Al was financially well off and had no need for the cash that he would receive from selling the stock. However, Al wanted to accommodate Don's objectives and so went along with Don's idea. He agreed to sell ANC Class B nonvoting shares so that he would not lose voting control of ANC.

During 1973 through 1975, other holders of Class B stock were not solicited to sell their shares in connection with the stock bonus plan.

RESOLVED: The [ANC] Plan be revised as follows:

Paragraph 4. Option to Take Stock or Cash, shall be amended to read as follows:

4. *Option to Take Stock or Cash.* Each employee shall have ten (10) days after being informed of the dollar value allocated to him to decide whether he wishes the net amount, after the withholding of taxes, to be paid to him all in cash or whether he wishes to buy Class B stock of [ANC] at the Current Formula Price for all or part of the amounts. If he elected to take part stock, he may not take less than 25% of the gross amount allocated to him. The gross amount is the amount before withholding taxes.

*  *  *  *  *  *  *

RESOLVED: The [ANC] Plan Paragraph 6, Subparagraph A be revised as follows:

A. *Retirement or Termination of Employment.* If an employee retires, quits or is discharged at any time, [ANC] shall have the option to purchase all or any part of each year's shares from him at the percentage of the Current Formula Price which follows:

| *If employee retires, quits or is discharged after receiving the stock within* | *The price to be paid the employee shall be* |
| --- | --- |
| One Year | 10% of the Current Formula Price |
| Two Years | 20% of the Current Formula Price |
| Three Years | 30% of the Current Formula Price |
| Four Years | 40% of the Current Formula Price |
| Five Years | 50% of the Current Formula Price |
| Six Years | 60% of the Current Formula Price |
| Seven Years | 70% of the Current Formula Price |
| Eight Years | 80% of the Current Formula Price |
| Nine Years | 90% of the Current Formula Price |
| Ten Years and thereafter | Current Formula Price |

provided that beginning at age 46 the price to be paid an employee shall be no less than a percentage which is equal to a fraction, the numerator of which shall be the number of years the employee is past age 45, and the denominator shall be 10. In no case shall such fraction be greater than 10/10ths.

The Current Formula Price shall be the Current Formula Price at the end of the year preceding such event. * * *

The ANC Plan as in effect before the 1976 amendments was used for bonuses authorized in 1973 and 1974, with respect to stock to be transferred to employees in 1974 and 1975, respectively. The ANC Plan incorporating the 1976 amendments was used for bonuses authorized in 1975 and 1976 with respect to stock to be transferred to employees in 1976 and 1977, respectively.

As noted *supra* (following table 1), ANC was reorganized, effective December 24, 1976, to become AMNACO. The plan of reorganization states that "[AMNACO] will agree to continue, adopt, and be bound by all the provisions and obligations of the [ANC Plan] as it is presently constituted." On February 10, 1978, the AMNACO board of directors approved the AMNACO Employee Stock Ownership Plan (hereinafter sometimes referred to as the AMNACO Plan), the provisions of which are essentially the same as those in the ANC Plan. The AMNACO Plan was used for bonuses authorized in 1977 for stock to be transferred to employees in 1978.

On July 22, 1980, AMNACO terminated the AMNACO Plan and eliminated the 10-percent vesting provision of the AMNACO Plan with respect to those employees who continued to hold stock subject to the AMNACO Plan. Thus, stock held by participants under the Transport Plan, ANC Plan, and AMNACO Plan became fully vested as of that date. In addition, on that same date, employees holding stock received under the AMNACO Plan and the predecessor plans executed Employee Stock Redemption Agreements, which set forth the mechanism for achieving the following goals:

It is deemed in the best interests of the Corporation and its subsidiaries (which group of affiliated corporations is hereinafter called "AMNACO"), that such stock be purchased if an Employee dies, and that the Corporation have an option to purchase such stock on retirement, disability, or termination of employment with AMNACO. Further, each Employee desires assurance that, if he should die, his estate will receive a fair price for his stock in the Corporation, and on termination of employment, retirement, or disability he will have an option to require the Corporation to purchase his stock.

Also, pursuant to the Employee Stock Redemption Agreement, each employee could sell his or her shares at any time, after having given AMNACO the right of first refusal.

### The Nonemployee Buy-Sell Agreements

On January 30, 1972, Al, Agnes, and certain members of the Schneider family, who owned all of the stock in Transport, executed a buy-sell agreement (hereinafter some-

times referred to as the Transport Buy-Sell Agreement).[8] The Transport Buy-Sell Agreement provided as follows: (1) Transport has the right of first refusal if the shareholder wants to sell his or her stock, (2) the agreement covers all stock held by the parties to the Transport Buy-Sell Agreement except stock received by shareholders pursuant to the Transport Plan, which stock is subject to the Transport Plan's provisions, (3) if Transport chooses not to buy the shareholder's stock, then the shareholder may sell the stock to a person other than Transport free of the restrictions set forth in the Transport Buy-Sell Agreement, (4) no shareholder may encumber or dispose of the stock covered by the Transport Buy-Sell Agreement except by gift to a member of his or her "direct family" (in the event of any such transfer, the transferee will hold the stock subject to the Transport Buy-Sell Agreement and must sell the stock to Transport upon the transferee's death), and (5) the Transport stock certificates covered by the Transport Buy-Sell Agreement are to carry an endorsement thereon stating that the stock is subject to the terms of the Transport Buy-Sell Agreement.

On January 1, 1974, the Transport Buy-Sell Agreement was canceled, and the parties thereto and certain additional members of the Schneider family (all of whom at that point held stock in ANC rather than Transport as a result of the formation of ANC) executed the American National Non-Employee Buy-Sell Agreement (hereinafter sometimes referred to as the ANC Buy-Sell Agreement). The provisions of the ANC Buy-Sell Agreement are in many respects similar to those set forth in the Transport Buy-Sell Agreement except for the following differences: (1) the ANC Buy-Sell Agreement excludes from its coverage stock received by employees under the Transport Plan or the ANC Plan, (2) the ANC Buy-Sell Agreement requires shareholders desiring to sell their stock to offer their stock first to ANC at the "Current Formula Price", (3) the ANC Buy-Sell Agreement provides for installment payments of the excess of the total price over $50,000, and (4) if ANC declines to purchase the stock

---

[8]The remaining shareholders referenced in the Transport Buy-Sell Agreement presumably were certain employees of Transport who were to receive stock pursuant to the Transport Plan within the next few months. See 1971 Bonus *infra*.

at the Current Formula Price, the ANC Buy-Sell Agreement permits the shareholders to sell the stock to persons other than ANC at a higher price, but not at a lower price without first offering the stock to ANC again.

On March 12, 1974, in order to accommodate its decision to allow employees to buy stock directly from Al,[9] ANC's board of directors resolved to waive ANC's right of first refusal under the ANC Buy-Sell Agreement with regard to stock transferred to employees in 1974 as part of the bonus authorized for 1973.

Under the plan of reorganization pursuant to which ANC became AMNACO, AMNACO was to "agree to continue, adopt, and be bound by all the provisions and obligations of the [ANC Buy-Sell Agreement] as it is presently constituted."

## Operation of the Stock Bonus Plans

The following discussion describes the manner in which bonuses were awarded by Transport, ANC, or AMNACO, as the case may be, to key employees of these corporations and the various affiliated corporations for the period 1971 through 1977. In general, each year a total amount was specified for that year's bonuses. Certain key employees were selected to participate in the stock bonus plan. These employees were then notified, by letter, of their eligibility to receive stock, before being advised of the amount of the bonus, but were advised that they could take their entire bonuses in cash if they did not want to receive stock (e.g., because of personal cash needs). For most of the years, the employees who elected to receive stock had to take a minimum of 25 percent of their bonuses in stock. Bonuses were not reduced merely because employees chose not to receive any stock at all. Moreover, the fact that an employee chose not to receive stock in one year would not affect his or her eligibility to participate in the stock bonus plan the following year.

Stock was offered to the electing employees at its book value. The following factors might affect the fair market value of the stock: no cash dividends had ever been paid (except as asserted by respondent in the instant case); there

---

[9]See the discussion of the Mar. 12, 1974, amendment to the ANC Plan with regard to the source of the stock used in the plan, *supra*.

was no public market for the stock; the company's growth, market position, and reputation; the appreciation of the stock; and the fact that the company received Interstate Commerce Commission Grants of Authority to operate in broad geographic regions. The company had no plans to liquidate the corporations or to become publicly traded. Employees had no opportunity to negotiate with Al as to the price to be paid for the shares, or with respect to the fact that the shares were subject to the 10-percent vesting provision; they could determine how much of their bonuses would be in stock, but even that was not a matter of negotiation with Al.

## 1971 Bonus

On December 30, 1971, the Transport shareholders[10] determined that the total bonus for 1971 under the Transport Plan would be $100,000. In addition, the shareholders determined that Transport's "Secretary is authorized to issue certificates for such number of shares as may be necessary to implement the bonuses which employees have elected to take in stock." Those employees of Transport and its affiliated corporations who were selected[11] to receive

---

[10]The Transport Plan states that "the Board of Directors of the Corporation shall determine the total amount to be given out in bonuses under this Plan"; however, at least in 1971, this decision was made by all the shareholders of Transport, which included the three members of the board of directors.

[11]The Transport Plan states that:

"The President of the Corporation shall then choose the employees who shall receive such bonuses and the cash amount for each, based on the performance of that employee, the results of the area of work under his control, his potentiality, and such other factors as the Directors deem relevant."

Moreover, at the time the shareholders determined the total amount of the 1971 bonus, they directed that:

"the President will select the employees eligible for bonuses and divide this amount among them. He shall also decide which employees may take their bonuses in stock under the plan. In making these decisions he shall consult with Donald J. Schneider. * * *"

In practice, it appears that although Al had the ultimate decision-making responsibility with respect to the eligibility of employees to receive bonuses and, if so, whether the bonus would be in the form of stock or cash, other management personnel, including Don, assisted in that process. That is, when the Transport Plan was first implemented, Don determined the companies' profitability and established a total bonus amount. He then decided who the potential recipients would be and, based on their years with the company and the responsibilities they assumed, he allocated amounts of the total bonus to each individual. Later, as the companies grew, Don asked other managers to make recommendations as to potential recipients, the amounts the recipients were to receive based on a mathematical formula, and whether the recipients could elect to receive stock. These recommendations were generally followed by Al and Don.

bonuses were notified on March 30, 1972, of the total amount of their individual bonuses, which included the amount that would be deducted for withholding taxes. Each selected employee was instructed that, in order to participate in the Transport Plan, the employee must sign the "Stock Bonus Plan Undertaking and Agreement" (hereinafter sometimes referred to as the 1971 Joinder Agreement) and the sec. 83(b) election, attached to the notice, and return these documents to Al within 7 days.[12] Those employees who elected to participate in the Transport Plan received part of their bonus in the form of a check to pay the taxes on the bonus,[13] and the balance in previously unissued Transport Class B nonvoting stock at the 1971 book value of $11.15 per share.

After the employees received notice of their eligibility to participate in the Transport Plan, those who elected to receive their bonuses in the form of stock executed 1971 Joinder Agreements, as required by Transport,[14] which provided as follows:

*Preamble.* The Employee has received a bonus in the form of Class B common stock of [Transport]. This agreement recognizes that the stock is subject to certain restrictions and the Employee has certain obligations.

---

[12]The typical notice that was sent by Al to employees eligible to participate in the Transport Plan read as follows:

"Enclosed is the stock purchase plan set up for the year 1971 for certain management employees for [Transport]. The total bonus for you is [$1,300].

"If you agree to the stock plan, we will issue a check to you to use to pay the taxes on this bonus of [$390]. The balance of the total will be issued to you in shares of * * * Transport Class B non-voting stock at the rate of $11.15 per share. The number of shares you will receive will be [82].

"After you have reviewed the enclosed plan, if you have any questions, please contact me to clear up any areas you do not understand. In order to agree to the plan you must sign both the "Stock Bonus Plan Undertaking and Agreement" and "Election Under Section 83(b) of IRC". A copy of each must be returned to me within the next seven days.

"The value of the bonus must be included in your 1971 income for state and federal tax purposes. This value is [$910]. If you have already filed your state and federal returns, you must file an amended return with the additional tax due by April 15."

The parties have stipulated, however, that as far as can be determined, the employees reported the amounts of the bonuses as income for the year after the bonuses were authorized (i.e., for 1972). In subsequent years, the notices stated that the bonus was to be reported for the year in which the bonus was to be received. As to the tax treatment of that part of the bonus that constituted taxes, see *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716, 729 (1929); *Safe Harbor Water Power Corp. v. United States*, 157 Ct. Cl. 912, 303 F.2d 928 (1962).

[13]Those employees who took their entire bonus in cash received the balance after Transport deducted withholding taxes.

[14]It appears that the employees may have filed sec. 83(b) elections only for the bonuses authorized in 1971 with respect to stock to be transferred in 1972.

Now, therefore, in consideration of the receipt of a bonus in the form of Class B common stock of [Transport], the Employee agrees to all the restrictions and undertakes all the obligations set forth in the [Transport Plan], a copy of which is attached hereto and made a part hereof.

Thereupon, in 1972, Transport issued 2,460 shares of Transport Class B nonvoting common stock to the six employees who elected to take their bonuses in stock at the "formula price" of $11.15 per share, for a book value of $27,429. Transport also paid to these six employees and 16 other employees a total of $72,571, of which $14,245.15 was in the form of checks representing the taxes on the bonuses.

Transport recorded the issuance of the 2,460 shares as additional "common stock" of $1,230 (2,460 × .50 par value) and additional "premium on capital stock" of $26,199 (2,460 × $10.65 per share).

As to bonuses for 1975 and thereafter (payments made in 1976 and thereafter), affiliated corporations whose employees received bonuses of ANC (or AMNACO) stock, were to reimburse Transport (or ANC or AMNACO) at the formula price for the amounts paid out by Transport (or ANC or AMNACO); however, it is not clear that was to be the case before 1975. In 1972, Transport was reimbursed $1,750.55 (157 × $11.15) by TNT for the shares of Transport stock issued to an employee of TNT.

The corporations deducted the total amount of the bonuses in the year the bonuses were authorized, rather than in the following year when the bonuses were paid. Thus, Transport and TNT deducted the total 1971 bonus for 1971.

*1972 Bonus*

On December 19, 1972, Transport's board of directors determined that the total bonus for 1972 under the Transport Plan would be $94,500. Those employees of Transport and its affiliated corporations who were selected to receive bonuses were notified on March 15, 1973, of the total amount of their individual bonuses, which included the amount that would be deducted for withholding taxes. The notices stated that the employees could receive the net amount of their bonuses in either cash or Transport Class B nonvoting stock. The employees were also instructed that

the entire bonus was to be reported in their 1973 income tax return and that this amount would be included in their Forms W-2. Each selected employee was required to sign a "Stock Bonus Plan Agreement by Employee" (hereinafter sometimes referred to as the 1972 Joinder Agreement). The 1972 Joinder Agreement, which was executed by the employee after he or she received the March 15, 1973, notice, set forth (1) the total bonus the employee was to receive including the amount to be deducted for withholding taxes, (2) a request that the employee designate the amount of the bonus that he or she wished to receive in cash and the amount in stock, (3) a statement that the stock to be received was restricted Transport Class B common nonvoting stock at $14 per share subject to the Transport Plan by which the employee would be bound, and (4) a statement that, notwithstanding paragraph 8 of the Transport Plan, legal counsel determined that employees need not file sec. 83(b) elections.

In 1973, Transport issued 685 shares of Transport's Class B nonvoting common stock to the three employees who elected to take all or part of their bonuses in stock at the "formula price" of $14 per share, for a book value of $9,590. Transport also paid to these three employees and 32 other employees a total of $88,410, of which $25,453.27 was in the form of withheld taxes.[15]

Transport recorded the issuance of the 685 shares as additional "common stock" of $342.50 (685 × $0.50 par value) and additional "premium on capital stock" of $9,244.50.[16] Transport and the other affiliated corporations deducted the total 1972 bonus for 1972. The employees reported the bonuses authorized in 1972 on their tax returns for 1973, the year in which they received the bonuses. None of the employees who received their 1972 bonuses in stock filed Sec. 83(b) Elections. (See notes 12 and 14, *supra*, as to the employees' treatment of the 1971 bonuses.)

---

[15]Thus, $98,000 was paid out, according to a stipulated exhibit. The parties have not sought to reconcile this with the $94,500 bonus authorization that is noted in another stipulated exhibit.

[16]The amount recorded by Transport as premium on capital stock should have been $9,247.50 (685 × $13.50).

*1973 Bonus*

On December 28, 1973, Transport's board of directors determined that the total bonus for 1973, under the (soon-to-be-adopted) ANC Plan, would be $150,000.

Those employees of Transport and its affiliated corporations who were selected to receive bonuses were notified on February 27, 1974, of their eligibility to receive bonuses, without being advised of the amount of their individual bonuses. Each selected employee was instructed to sign a form indicating whether he or she intended to participate in the ANC Plan. The employees were further advised that each employee who agreed to participate in the ANC Plan must elect to receive at least 25 percent of the total bonus allocated in stock.

By early March 1974, certain employees elected to receive stock under the ANC Plan by executing American National Employee Stock Ownership Plan Undertaking and Agreements (hereinafter sometimes referred to as 1973 Joinder Agreements"), before learning the amount of their bonuses. The 1973 Joinder Agreements provided that, in consideration of the receipt of stock under the ANC Plan, the employee agreed to all the restrictions and obligations under the ANC Plan.[17]

On March 29, 1974, those employees eligible for 1973 bonuses were notified (1) of their respective bonus amounts including the amount that would be deducted for withholding taxes, (2) of the minimum number of ANC Class B nonvoting common shares that could be purchased, and (3) that the price per share was $19[18] (the stock's consolidated book value as of December 31, 1973). Thereafter, the employees who elected to participate in the ANC Plan notified ANC of the proportions of ANC stock and cash they wished to receive.

For bonuses authorized in 1973, Transport issued two checks[19] in 1974 to each employee who had elected to

---

[17]Employees who received Transport stock previously under the Transport Plan executed slightly modified 1973 Joinder Agreements, which referenced the formation of ANC and the fact that all Transport stock had been exchanged for ANC stock.

[18]This $19-per-share price was the price of Transport stock before the 5-to-1 split. On Apr. 16, 1974, Transport's board of directors decided that the revised price under the ANC Plan would be $18.50 per old share of Transport or $3.70 per share for the new ANC shares.

[19]The sum of both checks equaled the total bonus for that employee less the deduction for withheld taxes.

receive part stock and part cash. On April 24, 1974, Transport issued checks to the employees representing the cash portion of their bonuses. On August 12, 1974, Transport issued a second check to each employee who was to receive part of his bonus in stock. The amount of this check was equal to the book value as of December 31, 1973, of the stock to be transferred to each employee. On the back of each check representing the stock portion of the bonus appeared the following restrictive endorsement: "Pay to the order of Al J. Schneider". These checks were then endorsed by the employees and given to Al. Al further endorsed the checks and deposited them in his personal checking account.

In 1974, ANC issued 10,837 shares of ANC's Class B nonvoting common stock to the 18 employees who elected to take all or part of their bonuses in stock at the "formula price" of $3.70 per share, for a book value of $40,096.90. Transport also paid to these 18 employees and 23 other employees a total of $108,403.10, of which $56,047.83 was in the form of withheld taxes.

On April 22, 1974, ANC canceled Certificate No. 1, which represented Al's ownership of 283,355 shares of ANC Class B nonvoting common stock, and issued Certificate No. 26 to Al for 272,518 shares of the same stock.[20] The 10,837 shares canceled on April 22, 1974, represent the same number of ANC Class B nonvoting common shares issued that same day to employees under the ANC Plan for 1973.[21]

Transport and the other affiliated corporations deducted the total 1973 bonus for 1973. The employees reported the bonuses authorized in 1973 on their tax returns for 1974, the year in which they received the bonuses. None of the employees who received their 1973 bonuses in stock filed sec. 83(b) elections.

---

[20]The certificate for the Class B nonvoting common shares that were issued to Al had the following restrictive language printed thereon:

"The shares of stock represented by this certificate are subject to the terms of the [ANC] Buy-Sell Agreement dated January 1, 1974, a copy of which is on file at the office of the Corporation."

[21]The certificates for the Class B nonvoting common shares that were issued to the employees on Apr. 22, 1974, had the following restrictive language printed thereon:

"The shares of stock represented by this certificate are subject to the current provisions of the [ANC] Plan, a copy of which is on file at the office of the Corporation."

*1974 Bonus*

On December 28, 1974, Transport's board of directors determined that the total bonus for 1974, under the ANC Plan, would be $166,000.[22]

Those employees of Transport and its affiliated corporations who were selected to receive bonuses were notified on February 20, 1975, of their eligibility to receive bonuses, without being advised of the amount of their individual bonuses. Each selected employee was instructed to sign a form indicating whether he or she intended to participate in the ANC Plan. The employees were further advised that each employee who agreed to participate in the ANC Plan must elect to receive at least 25 percent of the total bonus allocated in stock.

By mid-March 1975, certain employees elected to receive stock under the ANC Plan by executing agreements identical to the 1973 Joinder Agreements, before learning the amount of their bonuses.

On April 4, 1975, those employees eligible for 1974 bonuses were notified (1) of their respective bonus amounts including the amount that would be deducted for withholding taxes, (2) of the minimum number of ANC Class B nonvoting common shares that could be purchased, and (3) that the price per share was $4.50. Thereafter, the employees who elected to participate in the ANC Plan notified ANC of the proportions of ANC stock and cash they wished to receive.

For bonuses authorized in 1974, Transport issued two checks[23] on April 21, 1975, to each employee who had elected to receive part stock and part cash.[24] One check was

---

[22]On the same date, the boards of directors of several affiliated corporations determined their total bonus amounts, as follows:

| | |
|---|---:|
| Schneider Moving & Storage, Inc | $1,500 |
| Schneider Tank Lines, Inc. (Wis.) | 28,500 |
| Trans-National Truck, Inc. (Texas) | 4,000 |
| | 34,000 |

The stipulated exhibits indicate that, for 1974, the gross amount of bonuses actually paid totaled $200,000. However, although the amounts authorized to be paid also total $200,000, it appears that Transport actually paid to its employees $184,000, rather than the $166,000 authorized, and the affiliated corporations, not including Transport, actually paid $16,000 to their employees, rather than the $34,000 authorized by them.

[23]The sum of both checks equaled the total bonus for that employee less the deduction for withheld taxes.

[24]The checks to Don were issued on Mar. 15, 1975.

928

for the cash portion of the bonuses. The other check was equal to the book value, as of December 31, 1974, of the stock to be transferred to the employee. On the back of each check representing the stock portion of the bonus appeared the following restrictive endorsement: "Pay to the order of Al J. Schneider". These checks were then endorsed by the employees and given to Al. Al further endorsed the checks and deposited them in his personal checking account.

In 1975, ANC issued 9,623 shares of ANC's Class B nonvoting common stock to the 18 employees who elected to take all or part of their bonuses in stock at the "formula price" of $4.50 per share, for a book value of $43,303.50. Transport also paid to these 18 employees and 26 other employees a total of $156,696.50, of which $64,709.32 was in the form of withheld taxes.

Before the transfer of shares to the employees in 1975 with respect to the 1974 bonus, Al actually owned 43.15 percent of the total ANC shares; Agnes, Al's and Agnes' children, and Al's and Agnes' grandchildren, as a group, owned 55.35 percent of the stock. See table 2, below.

TABLE 2

| | Number of A shares | Percentage of A shares | Number of B shares | Percentage of B shares | Percentage of total shares |
|---|---|---|---|---|---|
| Al | 251,750 | 65.95 | 248,524 | 31.95 | 43.15 |
| Relatives[25] | 130,000 | 34.05 | 511,749 | 65.79 | 55.35 |
| Brenda and Patricia Schneider[25] | - - - | - - - | 6,166 | .80 | .54 |
| Nonrelatives | - - - | - - - | 11,251 | 1.46 | .96 |
| | 381,750 | 100.00 | 777,690 | 100.00 | 100.00 |

On May 12, 1975, ANC canceled Certificate No. 45, which represented Al's ownership of 248,524 shares of ANC Class B nonvoting common stock,[26] and issued Certificate No. 64 to Al for 238,901 shares of the same stock. The 9,623 shares canceled on May 12, 1975, represent the same

[25]Although Brenda Schneider and Patricia Schneider, Al's daughters-in-law, are relatives of Al, we have listed their stockholdings separately from the other relatives because sec. 318(a)(5)(B) precludes the attribution of their stockholdings to Al. See also sec. 318(a)(1)(A).

[26]On Dec. 27, 1974, Al gave certain family members gifts of 23,994 shares of ANC Class B nonvoting common stock. These gifts reduced his holding of this stock from 272,518 shares (see text at note 20 supra) to 248,524 shares.

number of ANC Class B nonvoting common shares issued that same day to employees under the ANC Plan for 1974.[27] Of the 9,623 shares, 4,361 went to three of Al's and Agnes' sons (Don—3,000, Paul—861, and James L. Schneider—500), and the remaining 5,262 went to nonrelatives. As a result, after the distribution of the 1974 cash and stock bonuses in 1975, Al's actual ownership of the total ANC shares decreased to 42.32 percent; the actual ownership of Agnes, Al's and Agnes' children, and Al's and Agnes' grandchildren in these shares increased to 55.73 percent. See table 3, below.

TABLE 3

| | Number of A shares | Percentage of A shares | Number of B shares | Percentage of B shares | Percentage of total shares |
|---|---|---|---|---|---|
| Al | 251,750 | 65.95 | 238,901 | 30.72 | 42.32 |
| Relatives | 130,000 | 34.05 | 516,110 | 66.37 | 55.73 |
| Brenda and Patricia Schneider | - - - | - - - | 6,166 | .79 | .53 |
| Nonrelatives | - - - | - - - | 16,513 | 2.12 | 1.42 |
| | 381,750 | 100.00 | 777,690 | 100.00 | 100.00 |

Transport and the other affiliated corporations whose employees received bonuses deducted the 1974 bonuses for 1974. The employees reported the bonuses authorized in 1974 on their tax returns for 1975, the year in which they received the bonuses. None of the employees who received their 1974 bonuses in stock filed sec. 83(b) elections.

*1975 Bonus*

On December 26, 1975, Transport's board of directors determined that the total 1975 bonus, under the ANC Plan, would be $171,850.[28] Those employees of Transport and its

---

[27]The certificates for the Class B nonvoting common shares that were issued to Al and to the employees on account of the stock bonus for 1974 had the same restrictive language as that set forth in notes 20 and 21 *supra*, respectively.

[28]On the same date, the boards of directors of several affiliated corporations determined their total bonus amounts as follows:

| | |
|---|---|
| Schneider Moving & Storage, Inc. | $2,750 |
| Schneider Tank Lines, Inc. (Wis.) | 27,500 |
| Schneider Warehouse & Storage, Inc. | 1,500 |
| Trans-National Truck, Inc. (Texas) | 5,600 |
| | 37,350 |

affiliated corporations who were selected to receive bonuses were notified on January 16, 1976, of their eligibility to receive bonuses, without being advised of the amount of their individual bonuses. The selected employees were instructed to sign a form indicating whether they intended to participate in the ANC Plan. The employees were further advised that each employee who agreed to participate in the ANC Plan must elect to receive at least 25 percent of the total bonus allocated in stock.

By early February 1976, certain employees elected to receive stock under the ANC Plan by executing agreements identical to the 1973 Joinder Agreements, before learning the amount of their individual bonuses.

On March 15, 1976, those employees eligible for 1975 bonuses were notified (1) of their respective bonus amounts, including the amount that would be deducted for withholding taxes, (2) of the minimum number of ANC Class B nonvoting common shares that could be purchased, and (3) that the price per share was $5.40. Thereafter, the employees who elected to participate in the ANC Plan notified ANC of the proportions of ANC stock and cash they wished to receive.

For bonuses authorized in 1975, Transport issued two checks[29] on March 15, 1976, to each employee who elected to receive part stock and part cash under the ANC Plan. One check was for the cash portion of the bonuses. The other check was equal to the book value, as of December 31, 1975, of the stock to be transferred to each employee. On the back of each check representing the stock portion of the bonus appeared the following restrictive endorsement: "Pay to the order of Al J. Schneider". These checks were then endorsed by the employees and given to Al. He further endorsed the checks and deposited them in his personal checking account.

---

Although the total thus authorized was $209,200, a stipulated exhibit shows the total paid as $208,200, of which $155,950 came from Transport and $52,250 came from the four above-noted affiliated companies and three other affiliated companies. Another exhibit, introduced without objection, shows variously that the total paid was $209,200 and $207,650. The parties do not note these disparate amounts. Our subsequent findings as to amounts paid are based on the stipulated exhibit.

[29]The sum of both checks equaled the total bonus for that employee less the deduction for withheld taxes.

In 1976, ANC issued 9,163 shares of ANC's Class B nonvoting common stock to the 23 employees who elected to take all or part of their bonuses in stock at the "formula price" of $5.40 per share, for a book value of $49,480.20. Transport also paid to these 23 employees and 35 other employees a total of $158,719.80, of which $50,954.46 was in the form of withheld taxes.

Before the transfer of shares to the employees in 1976 with respect to the 1975 bonus, Al actually owned 44.06 percent of the total ANC shares; Agnes, Al's and Agnes' children, and Al's and Agnes' grandchildren, as a group, owned 54.25 percent of the stock. See table 4, below.

TABLE 4

|  | Number of A shares[30] | Percentage of A shares | Number of B shares[31] | Percentage of B shares | Percentage of total shares |
|---|---|---|---|---|---|
| Al | [32]318,550 | 66.85 | 233,346 | 30.06 | 44.06 |
| Relatives | 157,983 | 33.15 | 521,665 | 67.21 | 54.25 |
| Brenda and Patricia Schneider | - - - | - - - | 6,166 | .80 | .49 |
| Nonrelatives | - - - | - - - | 14,993 | 1.93 | 1.20 |
|  | 476,533 | 100.00 | [33]776,170 | 100.00 | 100.00 |

On April 23, 1976, ANC canceled Certificate No. 64, which represented Al's ownership of 238,901 shares of ANC Class B nonvoting common stock, and issued Certificate No. 83 to Al for 224,183 shares of the same stock. The 14,718 shares canceled on April 23, 1976, represents the combined total of gifts made to family members of ANC Class B nonvoting common stock (5,555 shares; see table 4, n. 31, *supra*) and the number of ANC Class B nonvoting common shares (9,163 shares) issued that same day to employees under the

---

[30]On Dec. 22, 1975, Al gave Don, Paul, and James L. Schneider, each, 1,111 shares of ANC Class A stock.

[31]On Dec. 22, 1975, Al gave John Schneider, Kathleen Schneider, David Schneider, Jennifer E. Schneider, and Paul, each 1,111 shares of ANC Class B stock.

[32]On Sept. 1, 1975, ANC acquired, in a reorganization transaction, the stock of Truck Rentals, Inc., a corporation whose stock was wholly owned by Al, and Schneider Moving & Storage, Inc., the Class A stock of which was wholly owned by Al, and the Class B stock of which was owned by Al and David Schneider. As part of these transactions, ANC issued additional ANC Class A voting stock to Al (70,133 slares) and to David Schneider (24,650 shares).

[33]In January 1976, Bill Ryan, one of the employees, had ANC redeem 1,520 shares of his Class B stock, thus reducing the total outstanding Class B shares from 777,690 to 776,170. See discussion *infra*.

ANC Plan for 1975.[34] Of the 9,163 shares, 3,211 went to two of Al's and Agnes' sons (Don—2,100 and Paul—1,111), and the remaining 5,952 went to nonrelatives. As a result, after the distribution of the 1975 cash and stock bonuses in 1976, Al's actual ownership of the total ANC shares decreased to 43.33 percent; the actual ownership of Agnes, Al's and Agnes' children, and Al's and Agnes' grandchildren in these shares increased to 54.51 percent. See table 5, below.

TABLE 5

| | Number of A shares | Percentage of A shares | Number of B shares | Percentage of B shares | Percentage of total shares |
|---|---|---|---|---|---|
| Al | 318,550 | 66.85 | 224,183 | 28.88 | 43.33. |
| Relatives | 157,983 | 33.15 | 524,876 | 67.62 | 54.51 |
| Brenda and Patricia Schneider | - - - | - - - | 6,166 | .80 | .49 |
| Nonrelatives | - - - | - - - | 20,945 | 2.70 | 1.67 |
| | 476,533 | 100.00 | 776,170 | 100.00 | 100.00 |

Transport and the other affiliated corporations whose employees received bonuses deducted the 1975 bonuses for 1975. Transport was reimbursed by the other affiliated corporations for cash paid out by Transport to employees of the affiliated corporations.

The employees reported the bonuses authorized in 1975 on their tax returns for 1976, the year in which they received the bonuses. None of the employees who received their 1975 bonuses in stock filed sec. 83(b) elections.

*1976 Bonus*

On December 24, 1976, Transport's board of directors determined that the total 1976 bonus, under the ANC Plan,[35] would be $199,600.[36] Certain employees were notified of

---

[34]The certificates for the Class B nonvoting common shares that were issued to Al and to the employees on account of the stock bonus for 1975 had the same restrictive language as that set forth in notes 20 and 21 *supra*, respectively.

[35]We note that the AMNACO Plan was not formally adopted until Feb. 10, 1978, and that the employees signing Joinder Agreements in 1977 technically were agreeing to the restrictions and obligations of the ANC Plan. As previously noted, at the time ANC was reorganized into AMNACO (i.e., Dec. 24, 1976), AMNACO adopted the ANC Plan, as modified.

[36]On the same date, the boards of directors of several affiliated corporations determined their respective total bonus amounts, as follows:

their eligibility to receive bonuses without being advised of the amount of their bonuses. Those employees who elected to receive stock under the ANC Plan executed AMANCO Undertaking and Agreements (hereinafter sometimes referred to as 1976 Joinder Agreements). By signing the 1976 Joinder Agreements, the employees agreed to all the restrictions and obligations of the AMNACO Plan (see note 35, *supra*).

In 1977, the corporations returned to the approach that had been used in 1972 and 1973; they departed from the two-check approach that had been used in 1974, 1975, and 1976. Thus, AMNACO issued 8,835 shares of AMNACO's Class B nonvoting common stock to the 29 employees who elected to take all or part of their bonuses in stock at the "formula price" of $7.50 per share, for a book value of $66,262.50. There was paid to these 29 employees and 33 other employees a total of $192,237.50, of which $82,822.38 was in the form of withheld taxes.

Transport and the other affiliated corporations whose employees received bonuses deducted the 1976 bonuses for 1976. The employees reported the bonuses authorized in 1976 on their tax returns filed for 1977, the year in which they received the bonuses. None of the employees who received their 1976 bonuses in stock filed sec. 83(b) elections.

Transport was reimbursed by the other affiliated corporations for cash paid out by Transport to employees of the affiliated corporations. The affiliated corporations paid AMNACO $66,262.50 ($7.50 × 8,835) for issuing the 8,835 AMNACO shares to their employees. AMNACO reflected the issuance of the 8,835 shares on its December 31, 1977, balance sheet as $883.50 ($0.10 × 8,835) additional paid-in

| | |
|---|---|
| National Refrigerated Transport, Inc | $8,500 |
| Schneider Moving & Storage, Inc | 2,750 |
| Schneider Tank Lines, Inc. (Wis.) | 34,300 |
| Schneider Warehouse & Storage, Inc | 1,500 |
| Trans-National Truck, Inc. (Texas) | 6,750 |
| WNI, Inc | 6,600 |
| | 60,400 |

Although the total thus authorized was $260,000, a stipulated exhibit shows the total paid as $259,500, of which $185,600 came from Transport and $73,900 came from the six above-noted affiliated companies and two other affiliated companies.

capital and $65,379 ($7.40 $\times$ 8,835) additional premium on capital stock.

*1977 Bonus*

As was previously noted, the AMNACO Plan was used for the bonuses authorized in 1977 for stock to be transferred to employees in 1978.

In 1978, AMNACO canceled some AMNACO Class B nonvoting common stock that was owned by petitioners' children and which was subject to the ANC Buy-Sell Agreement. In exchange for this stock, these shareholders received the December 31, 1977, book value of the shares. In 1978, AMNACO issued AMNACO Class B nonvoting common stock, subject to the AMNACO Plan, to those employees who had elected to receive stock as part of their 1977 bonus. The number of shares issued to the employees under the AMNACO Plan equaled the number of shares owned by petitioners' children that was canceled by AMNACO.

## Redemptions Under the Stock Bonus Plans

During the period 1972 through 1977, several employees of Transport and its affiliated corporations, who had received part of their bonuses in stock, terminated their respective employments with these corporations. Thus, in accordance with the Transport Plan, the ANC Plan, or the AMNACO Plan, as the case may be, Transport, ANC, or AMNACO, respectively, agreed to exercise its option to purchase the employees' stock at the current formula price which applied the 10-percent vesting provision (as modified by the ANC Plan or the AMNACO Plan) to the book value, determined at the end of the year before the termination occurred.[37]

Specifically, on October 31, 1972, Charles Hoch (hereinafter sometimes referred to as Hoch) terminated his employment with TNT. On September 12, 1972, Transport had issued to Hoch a certificate for 157 shares of Transport Class B nonvoting common stock under the Transport Plan

---

[37]When employees offered to sell their stock back to Transport, ANC, or AMNACO, as the case may be, under the respective stock bonus plan, the corporation in most instances purchased the stock because the corporation did not want the shares to be available to persons other than the employees. However, the corporation was not obligated to purchase the shares tendered to the corporation.

with respect to his 1971 bonus. Because the book value for his shares under the Transport Plan at the time Hoch terminated his employment was $1,750.55, in 1972, Transport paid him $175.06 under the 10-percent vesting provision of the Transport Plan and his certificate was canceled in exchange therefor. Hoch did not receive any termination pay.

On November 11, 1975, William E. Ryan (hereinafter sometimes referred to as Ryan) terminated his employment with Transport. He had acquired a total of 1,520 shares of ANC Class B nonvoting common stock, 750 shares in 1973 and 770 shares in 1974, subject to the provisions of the ANC Plan. Because the book value for his shares under the ANC Plan at the time Ryan terminated his employment was $6,840, Transport paid him 30 percent of this amount, i.e., $2,043, under the 10-percent vesting provision of the ANC Plan, and his stock certificates were canceled in exchange therefor. Ryan did not receive any termination pay.

On July 15, 1976, Gary Grant (hereinafter sometimes referred to as Grant) terminated his employment with Transport. He had acquired 93 shares of ANC Class B nonvoting common stock, as part of his bonus for 1975. Because the book value for his shares under the ANC Plan at the time Grant terminated his employment was $502.20, in 1976, ANC paid him 10 percent of this amount, i.e., $50.22, under the 10-percent vesting provision of the ANC Plan, and his stock certificate was canceled in exchange therefor. In 1976, Grant also received $5,000 from Transport as termination pay, which was unrelated to amounts paid under the ANC Plan. In addition, he received $451.98— the difference between the book value of his shares as of the date of his termination with Transport and the amount he was to (and did) receive under the ANC Plan.

On August 15, 1977, John McErlane (hereinafter sometimes referred to as McErlane) terminated his employment with Green Bay Maintenance, Inc. He had acquired 67 shares of AMNACO Class B nonvoting common stock in 1977. Because the book value for his shares at the time McErlane terminated his employment was $502.50, AMNACO paid him 10 percent of this amount, i.e., $50.25, under the 10-percent vesting provision, and his stock certificate was

canceled in exchange therefor. McErlane did not receive any termination pay.

At least two other employees, Chuck Petruska and Paul Watkins, also terminated their employment and had their shares redeemed. These employees, however, received the full value of their shares because the 10-percent vesting provision had been eliminated from the AMNACO Plan.

## Petitioners' Tax Treatment of the Canceled Shares

On their 1974, 1975, and 1976 tax returns, petitioners reported the transactions as sales of 10,837 shares, 9,623 shares, and 9,163 shares, respectively, of Al's ANC Class B nonvoting stock, giving rise to long-term capital gains.

In substance, in 1975 and 1976 Al did not sell his ANC Class B nonvoting common stock to the employees; rather, that stock was redeemed by Transport.

These redemptions did not deprive Al of his ability to control ANC and the affiliated corporations.

## OPINION

Respondent contends that the transfers of ANC Class B nonvoting stock to the employees in 1975 and 1976 were redemptions of Al's stock followed by the issuance of the stock to the employees under the ANC Plan. Respondent contends, further, that the redemptions were essentially equivalent to dividends (contrary to the requirements of sec. 302(b)(1)[38]), and that the checks issued to the employees

---

[38]Sec. 302 provides, in pertinent part, as follows:

SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1) * * * of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

\*     \*     \*     \*     \*     \*     \*

(d) REDEMPTIONS TREATED AS DISTRIBUTIONS OF PROPERTY.—Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies.

with restrictive endorsements to Al should not be treated as payments in exchange for Al's stock (see sec. 302(a)), but should be treated as distributions of property to Al with respect to his stock (under secs. 302(d) and 301)—i.e., as dividends.

Respondent relies upon two alternative theories in so characterizing the stock transfers. First, respondent collapses the various steps of the transaction to show that, in reality (1) the employees actually received stock directly from ANC because the checks that represented the stock portion of their bonuses had to be endorsed over to Al, and (2) ANC redeemed Al's stock in order to acquire the stock that it issued to the affiliated group's employees.

Respondent's second alternative theory is based on the applicability of subsections (a) and (h) of section 83, and section 1.83-6(d)(1), Income Tax Regs. That regulation requires that, if stock is transferred by a shareholder to an employee and money is paid by the employee to the shareholder in exchange therefor, then the money paid to the shareholder is to be treated as if it were paid to the corporation for the stock and transferred immediately thereafter by the corporation to the shareholder as a distribution to which section 302 applies.

Petitioners contend that employees who elected to receive stock under the ANC Plan actually or constructively received their bonuses in cash; the employees then used all or parts of their bonuses to purchase stock from Al. Petitioners deny that a redemption of Al's stock occurred, arguing that bona fide business reasons existed for having Al, rather than ANC, provide the stock to the employees. Petitioners contend that even if there was a redemption of Al's stock, the redemption was not essentially equivalent to a dividend under section 302(b)(1). Moreover, petitioners argue that section 83 and the regulations thereunder do not apply to the instant case because (1) the employees could have received all cash, (2) the employees paid full value for their stock, (3) section 1.83-6(d)(1), Income Tax Regs., is invalid, and (4) the regulation, even if valid, should not be applied retroactively.

We agree with respondent's first alternative argument, based on the application of the step-transaction doctrine. As

a result, it is unnecessary for us to consider the applicability of section 83 and the validity of the regulations thereunder.[39]

In general, the "incidence of taxation depends upon the substance of a transaction" rather than its mere form. E.g., *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945). A taxpayer has the right to minimize taxes as far as the law allows (*United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451, 455 (1950); *Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *United States v. Isham*, 84 U.S. 496, 506 (1873)); however, the taxpayer ordinarily may not through form alone achieve tax advantages which substantively are without the intent of the statute. *Commissioner v. Court Holding Co., supra*; *Gregory v. Helvering, supra*. Several acts accomplishing a certain result may substantively constitute separate transactions, or successive steps in carrying out a single transaction, depending in part on the mutual interdependence and temporal proximity of the acts, the intent of the parties, and the ultimate result sought to be accomplished. *Zappo v. Commissioner*, 81 T.C. 77, 83-85 (1983); *Yamamoto v. Commissioner*, 73 T.C. 946, 953-954 (1980), affd. without published opinion 672 F.2d 924 (9th Cir. 1982); *American Bantam Car Co. v. Commissioner*, 11 T.C. 397, 405 (1948), affd. 177 F.2d 513 (3d Cir. 1949). Whether a series of transfers resulting in a sale constitute for tax purposes one or several transactions is a question of fact. *United States v. Cumberland Pub. Serv. Co., supra*; *Commissioner v. Court Holding Co., supra*. In deciding this question, each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed into a sale by another by using the latter as a mere conduit through which to pass title. *Commissioner v. Court Holding Co., supra*. Although a transaction between a sole shareholder and the shareholder's corporation is not at arm's length, and so is subject to close scrutiny, this does not of itself justify disregarding

---

[39]The U.S. Supreme Court granted certiorari on Nov. 18, 1986, 479 U.S. ___, in *Fink v. Commissioner*, 789 F.2d 427 (6th Cir. 1986), revg. and remanding T.C. Memo. 1984-418, to decide whether the principal shareholders of a closely held corporation can deduct ordinary losses when they make a non-pro-rata surrender of stock to strengthen the corporation's financial position. The Court of Appeals' opinion in *Fink* and the opinions in several of the cases analyzed in *Fink* deal with sec. 83 and some of the regulations thereunder.

the transaction for tax purposes. *Yamamoto v. Commissioner*, 73 T.C. at 954.

In the instant case, Al caused ANC to establish a bonus plan pursuant to which an eligible employee could elect to take part or all of his or her bonus in cash or ANC stock. Under the ANC Plan, as in effect for 1974 and 1975, an elaborate mechanism was implemented to allow an employee to "purchase" stock from Al, using at least 25 percent of his or her bonus. This purchase was effected through the following steps. First, Transport issued two checks to the employee, one of which represented the cash portion of the bonus (if any) and the other of which represented the book value of the shares the employee previously had elected to purchase. Second, because the restrictive endorsement, "Pay to the order of Al J. Schneider", appeared on the reverse side of this latter check, the employee endorsed the check over to Al in order to receive his or her shares. (No such restrictive endorsement appeared on the check representing the cash portion of the bonus.) Third, ANC waived its rights under the ANC Buy-Sell Agreement so that Al's stock could be sold directly to the employees rather than to ANC. Fourth, the stock was then transferred to the employees on ANC's record books. Fifth, the stock certificate that the employees received did not include the same restrictive endorsement with respect to the ANC Buy-Sell Agreement as did the stock in Al's hands; rather, a new endorsement appeared on the stock certificates issued to the employees, indicating that the stock was subject to the terms and conditions of the ANC Plan.

With respect to the factor of mutual interdependence, courts have looked at whether the steps were so substantively interdependent that the legal relations created by one transaction would have been fruitless without completion of the other transactions. *Yamamoto v. Commissioner*, 73 T.C. at 955; *H.B. Zachry Co. v. Commissioner*, 49 T.C. 73, 82 (1967); *American Bantam Car Co. v. Commissioner*, 11 T.C. at 405-407. In the instant case, the various steps of this transaction clearly were mutually interdependent. The purpose of the ANC Plan was to provide the employees with the opportunity to acquire stock in ANC. We have no evidence that the employees were concerned with whether ANC issued

the stock directly to them or whether they received it directly from Al. However, receipt of a check with an endorsement requiring the transfer of the check to Al had no value to an employee unless Al agreed to accept the check and transfer the stock in exchange therefor. We have no reason to believe that Al would have transferred the stock either to the employees or to ANC without some consideration for this transfer. Thus, the issuance of separate checks with restrictive endorsements was but one step in a series of steps to provide the appearance of a direct sale, but the substance of an employee stock bonus plan, with Al's stock being used to carry out the plan. The dual objectives of having the employees receive stock and Al receive consideration could not be accomplished unless all the steps were undertaken. To reiterate, the mere issuance to the employees of a check endorsed to Al would have been valueless to the employees unless Al agreed to complete the steps and exchange his stock for these checks. Moreover, ANC could not have offered stock to the employees without dilution of earnings and profits unless Al agreed to have his shares reissued to the employees.

With respect to the time factor, it should be noted that the mere fact that steps occur close in time does not conclusively establish that they are interrelated. *Yamamoto v. Commissioner*, 73 T.C. at 955. However, the instant case presents a pattern that emerged over several years, including the years in issue. That is, for the 1973 through 1975 bonuses, Transport would determine in late December of that year the total amount of the bonuses to be paid to the employees. Sometime during February of the following year, the employees were notified of their eligibility to receive at least 25 percent of their bonuses in stock and by March they were notified of the actual bonus amounts. The employees then had to determine exactly how much stock they wished to acquire. The pairs of checks generally were issued to the employees no later than the end of April and the checks representing the stock portion of the bonus generally were endorsed over to Al and deposited in petitioners' account within 1 month thereafter. Thus, within a 5-month period, each year for 3 years, bonuses were authorized, the employees received the bonuses, Al's stock

was "sold", and the employees exchanged the checks received that represented the stock portion of their bonuses for the stock. We are convinced that this repetitious pattern that occurred over a relatively short period of time had the effect of a redemption of Al's stock and use of that stock for a corporate stock bonus plan.

That a redemption of Al's stock was the ultimate result intended by Al and ANC, and not a sale thereof by Al to the employees, is further evidenced by the fact that the employees had no opportunity to negotiate with Al as to the terms of the sale. The price was set by Transport each year, as was the requirement that the shares be transferred subject to the conditions of the ANC Plan. The employees had the right to negotiate only as to the number of shares they wanted to acquire, and that was not a negotiation with Al, the "seller" of the stock. Facts such as these do not represent the kind of arm's-length bargaining that typically accompanies a sale between unrelated parties. The totality of the steps in these transactions is not consistent with the substance of sales by Al to the employees. This, too, leads us to conclude that Al and ANC intended to have Al's stock redeemed by ANC, and not sold by Al to the employees.

At the start of each year's stock bonus process, Al had stock and the corporations had funds. At the end of each year's stock bonus process, Al had funds that came from the corporations, and the corporations' employees had stock that came from Al. Although the funds ostensibly were paid by the corporations to the employees, the employees had no choice but to turn those funds over to Al; thus the employees were merely conduits of the funds. Although the stock ostensibly was sold by Al to the employees, the stock in the employees' hands was restricted in accordance with the corporations' stock bonus plan and not in accordance with the restrictions that applied to stock in Al's hands. Thus, the effect was that the stock was issued to the employees as part of the stock bonus plan, and not merely as a recordation on the corporate books of a private transfer between shareholders.

We conclude that the transactions were mutually interdependent, that the transactions took place in a relatively short period of time each year, that redemptions and not

sales were intended, and that the effect of each set of transactions was a redemption of Al's stock by ANC and not a sale by Al to the employees.

We take our text from *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613-614 (1938), as follows:

A given result at the end of a straight path is not made a different result because reached by following a devious path. The preliminary distribution to the stockholders was a meaningless and unnecessary incident in the transmission of the fund to the creditors, all along intended to come to their hands, so transparently artificial that further discussion would be a needless waste of time. The relation of the stockholders to the matter was that of a mere conduit. * * *

Applying this test, we conclude that the intended employee compensation was the stock, not the checks already endorsed to Al. The companies redeemed the stock from Al. The roundabout route of the checks was "a meaningless and unnecessary incident". The employees were mere conduits. The transactions were redemptions of Al's stock and not sales by Al to the employees.

Even if Transport, rather than ANC, is treated as the direct source of the ANC stock issued to the employees, the tax consequences to Al remain the same. Under section 304(a)(2),[40] Transport would be treated as having distributed property to ANC which then used the property to redeem Al's ANC stock. Thereupon, the deemed redemption by ANC of Al's Class B shares, using property provided by Transport (i.e., Transport's checks to the employees, restrictively endorsed to Al), is to be tested for dividend equivalency under section 302.

We now consider whether these redemptions were essentially equivalent to dividends.

As a general rule, when property is distributed by a corporation to a shareholder with respect to the corporation's stock, the distribution is taxable as a dividend to the

---

[40]SEC. 304. REDEMPTION THROUGH USE OF RELATED CORPORATIONS.
(a) TREATMENT OF CERTAIN STOCK PURCHASES.—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(2) ACQUISITION BY SUBSIDIARY.—For purposes of sections 302 and 303, if—
　　(A) in return for property, one corporation acquires from a shareholder of another corporation stock in such other corporation, and
　　(B) the issuing corporation controls the acquiring corporation,
then such property shall be treated as a distribution in redemption of the stock of the issuing corporation.

recipient. Secs. 301(a), 301(c), and 316(a). However, section 302(a) provides that if a corporation redeems its stock and one of the paragraphs of section 302(b) applies, then the redemption is treated as being in part or full payment in exchange for the corporation's stock. If the stock is a capital asset, then gain realized on the deemed exchange will be capital gain. Sec. 1222. Petitioners urge that, if we hold that the transactions constitute redemptions of Al's stock, then the redemptions should be treated as sales, resulting in long-term capital gains pursuant to section 302(b)(1).

Section 302(b)(1) applies to a redemption if it "is not essentially equivalent to a dividend." As we recently stated, in *Cerone v. Commissioner*, 87 T.C. 1, 18 (1986)—

in *United States v. Davis*, 397 U.S. 301 (1970) * * * , the Supreme Court held that: (1) The constructive ownership rules of section 318 apply to dividend equivalency determinations under section 302(b)(1); (2) redemptions of stock held by a sole shareholder, including a "constructive" sole shareholder, are always essentially equivalent to a dividend under section 302(b)(1); (3) business purpose is irrelevant in determining dividend equivalency under section 302(b)(1); and (4) in order to avoid dividend equivalency, the redemption must result in a "meaningful reduction" in the shareholder's proportionate interest in the corporation. * * *

We have found that before the distribution of shares to the employees in 1975 with respect to the 1974 bonus, Al actually owned 43.15 percent of the total ANC shares. Pursuant to section 318(a)(1)(A), Al is also deemed to own stock owned by Agnes, their children, and their grandchildren, i.e., 55.35 percent. (See note 25 *supra*.) Thus, before the 1975 redemption Al owned, actually and constructively, 98.50 percent of the total ANC shares. (See table 2 *supra* at p. 928) After the distribution of the 1974 cash and stock bonuses in 1975, Al's actual ownership of the ANC shares decreased to 42.32 percent. However, because of the application of the constructive ownership rules, Al is deemed to own an additional 55.73 percent, for a total of 98.05 percent. (See table 3 *supra* at p. 929) Similarly, in 1976, immediately before the stock redemption, Al owned 44.06 percent of the total ANC shares and Agnes, their children, and their grandchildren owned, as a group, 54.25 percent, for a total of 98.31 percent. (See table 4 *supra* at p. 931) After the distribution of the 1975 cash and stock bonuses in

1976, Al's actual ownership of the ANC shares decreased to 43.33 percent. However, because of the application of the constructive ownership rules, Al is deemed to own an additional 54.51 percent, for a total of 97.84 percent. (See table 5 *supra* at p. 932) Thus, in 1975, the constructive redemption reduced the percentage of ANC shares actually and constructively owned by Al .45 percent (i.e., from 98.50 percent to 98.05 percent). And, in 1976, the constructive redemption reduced the percentage of ANC shares actually and constructively owned by Al .47 percent (i.e., from 98.31 percent to 97.84 percent).

The redemption of the Class B shares had no effect on Al's voting control of ANC since no voting shares were redeemed. The redemption of the Class B shares in 1975 reduced Al's actual and constructive ownership of the total stock by .45 percent; the reduction in 1976 was .47 percent. Thus, Al remained in a position that afforded him control over the corporation following the constructive redemptions. We have previously held a reduction of 9.51 percent (from 98.2 to 88.69) not to be "meaningful" within the holding of the *Davis* case where a dominant shareholder was not deprived "of his ability to control the corporate activities." *Fehrs Finance Co. v. Commissioner*, 58 T.C. 174, 185-186 (1972), affd. 487 F.2d 184 (8th Cir. 1973). In the instant case, the redemptions did not deprive Al of his ability to control ANC and the affiliated corporations.

We conclude that the redemptions of Al's stock in 1975 and 1976 were essentially equivalent to dividends, and accordingly the payments in exchange therefor are treated as distributions by ANC on account of Al's stock.

The parties argue about whether Al's stock was worth less than what Al received for it. We know how much Al received for his stock; the question is whether he received it by way of purchase by the employees or redemption by ANC (or Transport) and, if the latter, then whether the redemption was essentially equivalent to a dividend. The parties' fair market value dispute is irrelevant in the instant case.

Similarly irrelevant is petitioners' contention that there is no "bailout" (and therefore no dividend) because the corporations would have paid out the same amount of cash whether the employees took stock or took cash. It is more

to the point to compare what occurred in 1972, 1973, and 1977 when the stock bonus plan relied on ANC's (or AMNACO's) unissued stock, instead of Al's stock. In those years, the employees received their stock bonuses, but Al did not receive anything. The funds were still in corporate solution. In the years in issue, however, Al received the funds; they were no longer in corporate solution.

Petitioners conclude their opening brief as follows:

> Respondent is attempting to recast these sales of stock into different transactions which will bring in more revenue. Basically the question is whether, where there are two routes to accomplish a transaction, the taxpayer is entitled to choose the one with the most favorable tax consequences to him. As this Court said in *Daniel D. Palmer*, (Acq.) 62 TC 684, CCH Dec. 32739:

> " * * * there were two paths which he could have taken. He could have had the stock redeemed and then made a contribution of the assets, or he could have contributed the stock and let the donee arrange for the redemption. The tax consequences to the donor turn on which path he chooses, and so long as there is substance to what he does, there is no requirement that he choose the more expensive way. He arranged for the transfer to precede the redemption, and there is no reason for us to conclude that such a sequence of events lacked any more substance than for the redemption to precede the transfer, as suggested by the respondent."

We fully agree with the position the Court took in *Palmer v. Commissioner*, 62 T.C. 684, 693 (1974), affd. 523 F.2d 1308 (8th Cir. 1975). In *Palmer*, we held for the taxpayers. The difficulty that petitioners face in the instant case is that they used the form of a sale from Al to the employees but the substance of what was done was inconsistent with the form that petitioners chose. We have concluded that respondent is correct in the instant case because the substance of what was done fits the redemption analysis. Petitioners controlled both form and substance; they caused the form and substance to differ substantially; we follow the substance they chose.

We hold for respondent.

To take account of respondent's concessions,

*Decision will be entered under Rule 155.*