PROMPT FOODS CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; PRESTO FOODS CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Prompt Foods Corp. v. Commissioner
Docket Nos. 1085-82; 1086-82.
United States Tax Court
T.C. Memo 1988-337; 1988 Tax Ct. Memo LEXIS 367; 55 T.C.M. (CCH) 1397; T.C.M. (RIA) 88337; July 29, 1988; As amended August 1, 1988 *367 Petitioners entered into contracts with an unrelated corporation whereby petitioners purportedly bought cattle. Held: Petitioners did not buy cattle; deductions and investment credits are not allowed. Bennet Kleinman and Frederick N. Widen, for the petitioners. Richard S. Bloom, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal corporate income tax against petitioners as follows: Petitioner, Docket No.
Taxable Year Ending
Deficiency
Prompt Foods Corp., 1085-82
12/31/72
$ 42,839.29
12/31/73
16,455.96
12/31/74
11,319.37
12/31/75
8,405.64
12/31/77
5,755.92
Presto Foods Corp., 1086-82
9/30/72 32,730.32
9/30/73 134,770.97
9/30/74 53,685.40
9/30/75 29,926.00
9/30/76 10,760.00
12/30/77
15,773.00
12/31/78
4,841.00
These two cases were consolidated for trial, briefs, and opinion. The issue for decision is whether petitioners may take into account their claimed deductions, credits, and income from cattle breeding operations. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petitions were filed in the instant cases, the principal places *368 of business of petitioner Prompt Foods Corporation (hereinafter sometimes referred to as "Prompt") and petitioner Presto Foods Corporation (hereinafter sometimes referred to as "Presto") were in Cleveland, Ohio. Petitioners' business activities during the years in issue included the following: (1) selling food, sandwiches, and related items; (2) assembling and packaging food items; and (3) marketing cooked meat products. Apart from the transactions in dispute in the instant cases, petitioners' business activities did not include cattle farming during the years in issue. James R. Grdina (hereinafter sometimes referred to as "Grdina") is a rancher and has been actively involved in the cattle business since 1970. Grdina began selling cattle in 1970. During the years in issue, Grdina Financial, Inc. (hereinafter sometimes referred to as "Financial") was a Delaware corporation authorized to transact business in the State of Ohio. Grdina is Financial's president and principal shareholder. Each petitioner received a package of documents from Financial and on April 1, 1972, executed the following documents which were part of the package: (1) "Purchase Agreement"; (2) "Maintenance Contract"; *369 (3) "Security Agreement"; (4) "Promissory Note" for $ 50,000; and (5) "Promissory Note" for $ 165,000. Also included in each package was a projection entitled "Grdina Financial, Inc. Charolais Cattle Program: Program Schedule" and a document entitled "Bill of Sale." The terms and conditions of the documents in each package are identical to those in the other package. The purchase agreements provide essentially that Financial owned certain Charolais cattle [1] *370 *371 and that Financial is selling the cattle to Prompt or Presto, as the case may be, for $ 165,000. Grdina is stated to be personally, jointly and severally liable with Financial for some of the promises under the purchase agreements. Under the agreements, the appropriate petitioner agrees to make payment by means of a promissory note. The promissory note is to be secured by a security agreement. The agreement further provides that Financial and Grdina would replace any female animal which did not bear a calf within the first year. Each of the promissory notes provides that the principal amount is $ 165,000 and that interest accrues at an annual rate of 4 percent. The notes provide that interest was payable annually on March 30 of each year, starting in 1974. The notes further provide for the payment of principal essentially as follows: On or before April 1, 1972 -- $ 6,500; on or before March 30, 1974, and on or before April 1, each following year -- 6 percent of the unpaid principal balance; "On or before 1986" -- the unpaid balance. The notes refer to the purchase agreement and to a security agreement. The notes also state that they are nonrecourse. [2] *372 The security agreements grant Financial a security interest in "the cattle listed in Exhibit 'A' attached hereto and incorporated herein by this reference, and any and all additions, accessions, and substitutions thereof, including all progeny * * *." See n.1, supra.
On April 1, 1972, Financial executed bills of sale to Prompt and Presto. The bills of sale state that Financial "does hereby sell, grant, exchange, convey, transfer, assign and deliver to [the respective petitioner] (the 'grantee'), his legal representatives and assigns, the CHAROLAIS CATTLE described in Exhibit A attached hereto and made a part hereof * * *." See n.1 supra.
On April 1, 1972, each petitioner entered into a maintenance contract with Financial and Grdina whereby for a payment of $ 43,500 (due on execution), and annual payments of $ 6,000 (starting in 1974 and due *373 by March 30 of each year), Financial agrees to maintain, breed, and feed that petitioner's cattle. The contract provides generally that (1) Financial would replace any female over 3 months old and under 6 years old that died, was not fertile, or was culled by Financial; (2) on termination of the contract, Financial would use its best efforts to record the cattle with the relevant exotic breed association; (3) the contract would run for 7 years from April 1, 1972; [3] (4) Financial would idemnify the relevant petitioner against all claims and would pay all taxes (except Federal income taxes) arising from the cattle; (5) the cattle would be kept in Sioux Falls, South Dakota, unless the relevant petitioner agreed in writing to a change; (6) Financial guarantees that, at a minimum, each petitioner would receive 75 calves each year; (7) Financial agrees to buy all male calves at $ 350 each when they become 12 months old and to buy all female calves at $ 600 each when they become 24 months old; (8) each petitioner could sell and inspect its cattle at will; (9) Financial would provide quarterly status reports beginning April 1973; and, (10) Financial would insure the cattle. As with the purchase *374 agreements, security agreements, and the bills of sale, although petitioners' cattle are referred to as being described in the attached Exhibit A, no Exhibit A was attached to the maintenance contract at the time of execution. See n.1, supra. As a result of the promissory notes and maintenance agreements executed by petitioners, each petitioner was liable to Financial in the total amount of $ 50,000 on April 1, 1972 ($ 6,500 on the promissory note, plus $ 43,500 on the maintenance agreement). On that date, each petitioner "paid" the $ 50,000 by giving Financial a recourse promissory note. Each such recourse promissory note provides that the respective petitioner is to repay the principal of the note by paying $ 15,000 on or before April 15, 1973, and $ 5,000 each month thereafter, with the unpaid principal balance due November 15, 1973. Interest at a rate of 4 percent per year is to be paid monthly on the 15th day of each month beginning April 15, 1973. Petitioners paid in full the principal of these recourse promissory notes. Payments made by *375 petitioners to Financial which, at a minimum, paid in full the principal of the recourse promissory notes were as shown on table 1: Table 1
Prompt
Presto
Date of Payment
Amount Date of Payment
Amount
4/16/73
$ 15,000 4/16/73
$ 15,000
5/16/73
5,000 5/16/73
5,000
6/27/73
5,000 6/27/73
5,000
8/9/73
5,000 8/9/73
5,000
8/16/73
5,000 8/16/73
5,000
9/24/73
5,000 9/24/73
5,000
10/23/73
5,000 10/23/73
5,000
11/26/73
5,000 11/26/73
5,000
1/18/74
5,000 12/28/73
15,000
2/26/74
5,000 1/18/74
5,000
4/10/75
7,599 2/26/74
5,000 3/14/74
5,000 3/27/74
18.550 4/23/74
10,000 5/14/74
10,000 6/18/74
10,000 7/15/74
10,000 8/16/74
10,000 9/18/74
10,000 10/23/74
5,450 11/7/74
6,000 12/16/74
6,000 4/10/75
7,599 10/30/75
15,548 On April 30, 1972, each petitioner executed an "Amendment to Purchase Agreement", and an "Amendment to Maintenance Contract". The "Amendment to Purchase Agreement" documents are identical to each other and provide essentially that Financial grants to the respective petitioner the option, exercisable by September 30, 1972, to buy "an additional one hundred fifty (150) cows, and three (3) bulls, or any portion thereof, upon the same terms and conditions as set forth in the written agreement, attached hereto and marked 'Exhibit A' and made *376 a part hereof." The agreement also provides that the option exercise price is $ 330,000. The "Amendment to Maintenance Contract" documents amend the maintenance contracts to add the following provision: Owner [petitioner] shall have the option to repurchase all such calves [i.e., calves purchased by Financial] at the lesser of the then fair market value of [sic] $ 750.00 per female calf and $ 420.00 per male calf. Fair market value shall be determined by an appraiser mutually agreeable * * *. On October 1, 1972, Presto executed, as part of a package, the following documents: (1) "Purchase Agreement"; (2) "Maintenance Contract"; (3) "Security Agreement"; (4) "Promissory Note" for $ 100,000; and (5) "Promisory Note" for $ 330,000. Also included in the package was a projection titled "Grdina Financial, Inc. Charolais Cattle Program." No "Bill of Sale" was included in the package. The documents that Presto executed on October 1, 1972, are substantially similar to the documents executed by Presto on April 1, 1972, except that the amounts on the later documents are double the amounts on the earlier documents. The October 1, 1972, documents also refer to cattle described in "Exhibit A", *377 and also did not have the "Exhibit A" attachments attached thereto when the October 1, 1972, documents were executed. "Exhibit A" was sent to Presto at some indeterminate date. [4] As a result of the October 1, 1972, promissory note and maintenance agreement, Presto was liable to Financial in the total amount of $ 100,000 on October 1, 1972 ($ 13,000 on the promissory note, plus $ 87,000 on the maintenance agreement). On that date, Presto "paid" the $ 100,000 by giving Financial a recourse promissory note. Presto paid in full the principal of this recourse promissory note. (See table 1, supra.) This recourse promissory note provides that Presto is to repay the principal of the note by paying $ 15,000 on or before December 15, 1973, and $ 10,000 each month thereafter, with the unpaid principal balance due September *378 15, 1974. Interest at a rate of 4 percent per year is to be paid monthly on the 15th day of each month beginning December 15, 1973. Before petitioners executed any of the foregoing documents, they did not inspect or even see any of the cattle that were the subject of these documents. Petitioners did not maintain records of any individual animal's weight, calving history, or lineage. Petitioners did not maintain records of the performance of the bulls or their offspring. Petitioners did not maintain records with respect to the sale of any specific animal. The cattle were neither segregated nor marked (tagged, tattooed, or branded) to distinguish some cattle from others. When ownership of a purebred cow or bull is transferred, a pedigree form accompanies the animal. Financial represented to petitioners that they would receive the pedigree forms for their bulls. A cow which is fifteen-sixteenths Charolais may be registered as a purebred Charolais. Petitioners were never provided with registration papers or pedigree forms for the purebred bulls they purportedly purchased. Marvin Hines (hereinafter sometimes referred to as "Hines") was a vice-president of the First National Bank of *379 Oakes in Oakes, North Dakota (hereinafter sometimes referred to as "the Oakes Bank"). Hines met Grdina in 1975. In 1977, the Oakes Bank loaned about $ 82,000 to Financial. The loan was secured by Grdina's personal guarantee and an agreement granting the Oakes Bank a security interest in about 260 Charolais cows, about 53 yearling heifers, and 14 Charolais bulls. Hines or his assistant visually inspected the cattle each year. These cattle were located on James Henningson's and C. Harvey Henningson's farm. These were the only cattle on the farm at that time. James Henningson (hereinafter sometimes referred to as "Henningson") began to work for Grdina in 1975, caring for cattle on Henningson's ranch near Fullerton, North Dakota. Henningson saw Grdina truck cattle in to his ranch, and saw Grdina buy cattle several times. In 1975, Henningson initially cared for about 95 head of cattle for Grdina. At one point, he cared for about 635 head of cattle for Grdina; by 1983, the number had dropped below 125. Before 1980, Henningson was paid for his services by getting 80 percent of the herd's calf crop. After that, he was paid monthly in cash. When cattle were sold from this herd, the *380 proceeds were in the form of checks made out to Grdina and the Oakes Bank. Henningson did not have other cattle on his land while he was maintaining the herd for Grdina. [5] Henningson was not aware of Grdina's cattle programs. Henningson believed that the cattle he was maintaining for Grdina were Grdina's cattle. George Scully (hereinafter sometimes referred to as "Scully") maintained a herd of breeding cows for Grdina during the 1970's, and bought cattle for Grdina. In most of these purchases, Scully paid for the cattle and Grdina then reimbursed him. Scully did not have other cattle on his farm, near Wentworth, South Dakota, while he was maintaining Grdina's herd. In late 1970, when Scully began to maintain a herd for Grdina, the herd consisted *381 of grade cattle -- not purebred. The cattle had some Charolais blood, but probably less than 50 percent. After 1975, Grdina began to buy purebred Charolais. By about 1977, Scully was no longer maintaining grade cattle for Grdina. Scully stopped maintaining cattle for Grdina in mid-1980. While he was maintaining Grdina's herd, Scully did not keep records of individual animals and did not segregate animals in any manner that related to Grdina's cattle investment programs. After 1975, Grdina kept registration papers or pedigree forms on the purebred Charolais. At the end of 1972, Scully maintained a herd of about 600 head for Grdina -- about 350 on his farm and about 250 on a nearby farm. At the end of 1973, the herd had grown to about 900. During the first quarter of 1976, the herd (excluding unweaned calves) averaged 173 head. [6] *382 For his work in maintaining the cattle, Scully charged Grdina a monthly fee that, in 1970, was $ 12 or $ 12.50 per head, plus 20 percent of the calves at weaning time. (Scully did not charge for unweaned calves.) After 1971, Scully charged a greater amount of cash, but no longer took a portion of the calves as part of his fee. The montly charge had increased to $ 15 by about 1973 and was $ 18 by about 1979. William Harrington (hereinafter sometimes referred to as "Harrington") was a vice-president of the Dakota State Bank in Colman, South Dakota (hereinafter sometimes referred to as "the Colman Bank"). The Colman Bank, acting through Harrington, loaned money to Grdina and took back security interests, showing Grdina as owner of the collateral and listing collateral, as shown in table 2. Table 2
Date of Loan
Amount of Loan
Collateral
1/22/71 &
$ 10,000
1/7 Interest in the following:
3/17/71
147 Head of Registered Charolais    cows, average weight 1,100 lbs.,        2-5 yrs old        93 Registered Charolais calves,     average weight 250 lbs.        5 Registered Charolais bulls,      2-5 yrs old        12/31/71
16,000
65 Head of Charolais cows, average weight 1,000 lbs.    12/31/71
12,000
1/7 Interest in the following:
220 Head of Registered Charolais    cows, average weight 1,100 lbs.,        2-5 yrs old        5 Head of Registered Charolais      bulls, 2-5 yrs old        50 Head of Charolais steer calves     1/19/72
13,000
42 Head of Charolais cows, average weight 1,100 lbs.    12/31/72
12,000
1/7 Interest in the following head
of livestock:    89 Head of Registered Charolais     stock cows, average weight 1,100        lbs.        5 Head of Registered Charolais      bulls, average weight 1,400 lbs.        82 Head of Registered Charolais     calves, average weight 550 lbs.        3/01/73
37,280
100 Head of Registered stock cows,
average weight 1,050 lbs.    20 Head of Registered Charolais heifers, average weight 600 lbs.    4/02/73
9,000
30 Registered Charolais stock cows, average weight 1,100 lbs.    10/16/73
174,000
698 Head of cattle as follows:
372 Head of Charolais cows,    average weight 1,100 lbs.,        1-5 yrs old        11 Head of purebred Charolais     bulls at 1,600 lbs.        315 Head of Charolais calves    at 300 to 600 lbs.        12/18/74
136,000
515 Head of cattle as follows:
330 Head of Charolais cows,    average weight 1,200 lbs.        173 Head of Charolais calves,    average weight 425 lbs.        12 Head of Charolais bulls,     average weight 1,800 lbs.        *383 These loans were based on "driveouts" that Scully gave to the Colman Bank. A "driveout" is a receipt which is treated, in the cattle business, as a transfer of title to an animal that is not purebred; it serves a function similar to a bill of sale. In the Colman Bank security agreements as to the first, third, and fifth loans shown on table 2 (for $ 10,000, $ 10,000, and $ 12,000, respectively), Grdina is shown as a partnership; in all the other security agreements, Grdina is shown as an individual. Financial is not referred to in any of these security agreements. Each of these security agreements includes as collateral "all similar property now owned or hereafter acquired by" Grdina. Harrington frequently saw Charolais cattle on Scully's farm and ranch, which cattle he understood to be among those to which the Colman Bank's security interests attached. Some Colman Bank loans were repaid by Grdina and some by Financial. Sanford Goldfarb had been an officer of Presto since 1967; he saw some cattle in Oakes in the late 1970's or early 1980's. Dennis LoConti (hereinafter sometimes referred to as "Dennis") worked with Henningson at his ranch in Oakes maintaining and feeding cattle. *384 When Dennis began working at Henningson's ranch in October 1982, there were more than 800 cattle on the ranch. When Dennis left the ranch in October 1983, there were about 250 cattle on the ranch. Of this number, petitioners were in the process of taking possession of 235. Joseph A. LoConti is related to Dennis and has been the general manager of both petitioners since 1967. Joseph A. LoConti saw cattle at Henningson's ranch in Oakes in 1979 and 1982. Joseph E. LoConti, a brother of Dennis, saw cattle in October or November of 1972 in Colman or Wentworth, South Dakota, at which he had been told was Scully's ranch. The program schedules for each of petitioners' April 1, 1972, programs projects the cash flows shown on table 3; the program schedule for Presto's October 1, 1972, program projects the cash flows shown on table 4. Table 3
Program Schedule -- April 1, 1972
Cash Inflow
Cash Outflow
Proceeds from Calves
Payment On
Principal
Maintenance Contract
Date
M
F
Calf Crop
Payment
Interest
Payments
4/1/72
--
--
-0-
$ 6,500  -0-
$ 43,500
3/30/74
38
--
$ 13,300
9,510    $ 6,340
6,000   3/30/75
38
--
13,300  8,939    5,960  6,000   3/30/76
38
37
35,500  8,403    5,602  6,000   3/30/77
38
37
35,500  7,899    5,266  6,000   3/30/78
38
37
35,500  7,425    4,950  6,000   3/30/79
38
37
35,500  6,979    4,653  6,000   3/30/80
38
37
35,500  6,561 *  4,374  6,000   --
37
22,200  --
37
22,200  *385 Net Due to
(From)
Date
Petitioner
4/1/72
$ (50,000)
3/30/74
(8,500)   3/30/75
(7,599)   3/30/76
15,495    3/30/77
16,335    3/30/78
17,125    3/30/79
17,868    3/30/80
18,565    22,200    22,200    Table 4
Program Schedule -- October 1, 1972
Cash Inflow
Cash Outflow
Proceeds from Calves
Payment On
Principal
Maintenance Contract
Date
M
F
Calf Crop
Payment
Interest
Payments
10/15/72
--
--
-0-
$ 13,000  -0-
$ 87,000
10/15/74
75
--
$ 26,250
19,020    $ 12,680
12,000  10/15/75
75
--
26,250  17,879    11,919  12,000  10/15/76
75
75
71,250  16,806    11,204  12,000  10/15/77
75
75
71,250  15,798    10,532  12,000  10/15/78
75
75
71,250  14,850    9,900   12,000  10/15/79
75
75
71,250  13,959    9,306   12,000  10/15/80
75
75
71,250  * 13,121  8,748   12,000  --
75
45,000  --
75
45,000  Net Due to
(From)
Date
Petitioner
10/15/72
$ (100,000)
10/15/74
(17,450)   10/15/75
(15,548)   10/15/76
31,240     10/15/77
32,920     10/15/78
34,500     10/15/79
35,985     10/15/80
37,381     45,000     45,000     Increasing maintenance costs eventually forced Financial to stop paying the amounts due to petitioners under the program schedules described *386 in tables 3 and 4. Because Financial stopped making payments under these program schedules, petitioners sued Financial in October 1981 for the amounts shown as due on the program schedules through October 1981. [7] *387 The suit resulted in a judgment for petitioners as joint plaintiffs for about $ 335,000. The judgment was settled for 150 bred heifers. The stated purchase prices, nonrecourse note principal amounts, stated interest rate of the promissory notes, and stipulated fair market value of the cattle purportedly purchased are as is set forth in table 5: Table 5
Petitioner
Prompt
Presto
Date of Purported Purchase
4/1/72
4/1/72
10/1/72
Total
Stated Purchase Price of Cattle
$ 165,000
$ 165,000
$ 330,000
$ 660,000
Principal Amount of Non-
[8] *388 recourse Promissory Note 165,000  165,000  330,000  660,000  Interest Rate on Unpaid
Principal
4%
4%
4%
4%
Stipulated Fair Market
Value of Cattle
61,200   61,200   122,400  244,800  On their tax returns, petitioners reported income from the sale of calves and claimed deductions for (1) depreciation on the cattle, (2) interest on the promissory notes used in connection with the cattle programs, and (3) maintenance expenses under the maintenance contracts, for the years and in the amounts shown on tables 6 (as to Prompt) and 7 (as to Presto). Respondent disallowed for each year in issue, the excess of claimed deductions over reported income as shown on these tables. In addition, respondent disallowed investment credits claimed by petitioners based on the cattle programs, as disclosed in these tables. Table 6
Prompt
1972
1973
1974
1975
n9Interest $ -0-   $ 4,762
$ 6,050 $ 5,688 Maintenance
32,625
15,375
6,000 6,000 Depreciation
32,561
33,109
24,832 19,124 Total expenses claimed
$ 65,186
$ 53,246
$ 36,882 $ 30,812 Less: Income reported
from calf sales      -0-  -0-  (13,300)
(13,300)
Excess of claimed expenses over
reported income on cattle   operations   $ 65,186
$ 53,246
$ 23,582 $ 17,512 Investment credits
$ 11,550
Prompt
1976
1977
[9] Interest $ 5,337  $ 5,025  Maintenance
6,000 6,000 Depreciation
14,343 10,700 Total expenses claimed
$ 25,680 $ 21,725 Less: Income reported
from calf sales      (35,625)
(13,125)
Excess of claimed expenses over
reported income on cattle   operations   [10] *390 $ (9,945
$ 8,600  Investment credits
*389 Table 7
Presto
Taxable Year Ending
9/30/72
9/30/73
Interest (see n.9, supra)
$ 0-  $ 3,175  Maintenance
21,750
111,750
Depreciation
22,375
119,439
Total expenses claimed
$ 44,125
$ 234,364
Less: Income reported from calf sales
-0- -0- Excess of claimed expenses over
reported income on cattle operations   $ 44,125
$ 234,364
Investment credits
$ 11,550
$ 23,100 Presto
Taxable Year Ending
9/30/74
9/30/75
9/30/76
Interest (see n.9, supra)
$ 18,850 $ 17,675 $ 16,625 Maintenance
18,000 18,000 18,000 Depreciation
88,296 66,222 49,667 Total expenses claimed
$ 125,146 $ 101,897 $ 84,292 Less: Income reported from calf sales
(13,300)
(39,550)
(61,875)
Excess of claimed expenses over
reported income on cattle operations   $ 111,846 $ 62,347 $ 22,417 Investment credits
Presto
Taxable Year Ending
12/31/77
12/31/78
Interest (see n.9, supra)
$ 15,375 $ 18,900 Maintenance
18,000 24,000 Depreciation
38,861 46,426 Total expenses claimed
$ 72,236 $ 89,326 Less: Income reported from calf sales
(39,375)
(95,287)
Excess of claimed expenses over
reported income on cattle operations   $ 32,861 [11] $ (5,961)
Investment credits
*391 * * * Petitioners did not buy cattle under the April 1, 1972, and October 1, 1972, packages. OPINION Respondent contends that "Petitioners' purported purchases of cattle occurred neither in fact nor in substance." In support *392 of this contention, respondent asserts that either (1) petitioners did not, in fact, buy any cattle because the cattle they purportedly bought did not exist, and, if the cattle existed, they were not owned by Financial; or (2) even if the transactions in fact occurred, they were not, in substance purchases because the benefits and burdens of ownership were not transferred to petitioners; or (3) the transactions which formed the "cattle programs" were, in substance, loans from petitioners to Financial. Alternatively respondent contends that even if the purchases of cattle occurred in "fact and substance", the promissory notes constituted "neither genuine indebtedness nor actual investments in property." Petitioners argue that the transactions were in fact entered into by and among petitioners, Grdina, and Financial, and that the events and expenditures did take place. Petitioners contend that the transactions clearly make economic sense even without taking into consideration the tax benefits which petitioners derived from the program. Petitioners maintain that they made equity investments in the cattle. Petitioners further contend that "The evidence submitted to the Court clearly *393 proves that the cattle did exist and were in fact purchased by the Petitioners", and that "it is quite evident" that petitioners assumed the benefits and burdens of ownership of the cattle. Petitioners also assert that respondent's position that the transactions were in substance loans "is obviously without merit and directly conflicts with numerous authorities which have ruled on the characterization of payments as either debt or equity." We agree with respondent that the 1972 transactions were not, in substance, purchases of cattle by petitioners. Generally, taxable income includes gross income derived from business (sec. 61(a)(2)), [12] less deductions allowed for ordinary and necessary business expenses (sec. 162(a)), [13] and depreciation of property used in a business (sec. 167(a)(1)) [14]. Sec. 63(a). Section 38 allows as a credit against income tax an amount determined under sections 46 through 50 (the investment credit). [15] *395 Section 46 provides that, in general, the credit for a taxable year is an amount equal to a specified percentage of the taxpayer's basis of section 38 property (as defined in section 48) placed in service during the taxable year. Where a taxpayer never acquires *394 the property in question, the taxpayer is not allowed to deduct the claimed expenses based on ownership, nor depreciation, nor (except for the pass-through provisions of sec. 48(d)) investment credit. E.g., Cherin v. Commissioner,89 T.C. 986 (1987); Zirker v. Commissioner,87 T.C. 970 (1986); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221 (1981). From the record as a whole, we conclude that (1) Grdina was in the cattle business; (2) petitioners did not buy cattle from Financial or Grdina; and (3) the 1972 paperwork amounted to agreements to transfer funds at certain times, to create a facade of purchases and business expenses, and to generate tax benefits. In short, petitioners bought "nothing more than a package of tax consequences." [16]
Existence of Cattle
Clearly if the cattle purportedly bought by petitioners from Financial never existed, then any tax attributes associated with cattle ownership are unavailable to petitioners. [17] Petitioners bear the burden of proving the cattle existed. Rule 142(a). [18] *396 Unfortunately, while the record clearly establishes that some cattle existed, we are unable to determine, based on the record in this case, the extent to which the cattle were owned by Financial, the quantity of cattle, or the quality of cattle. [19] Petitioners purportedly bought from Financial, in 1972, a total of 300 cows and 6 bulls. [20] Each of these animals was at least one-half Charolais; 140 cows were three-fourths Charolais; 60 cows and 2 bulls were seven-eighths Charolais; 1 bull was fifteen-sixteenths Charolais; and 3 bulls [21] were purebred Charolais. Petitioners presented several witnesses to Grdina's and Financial's involvement with cattle, apparently to show that the cattle existed. Hines, a vice-president of the Oakes Bank, did not meet Grdina until 1975. The Oakes Bank lent money to Financial in 1977. None of the evidence from Hines or the Oakes Bank suggests that Financial (or Grdina, for that matter) owned the Charolais cattle that petitioners purportedly bought from Financial in 1972. Henningson cared for cattle on his ranch. He understood that they were Grdina's cattle and was unaware of any ownership of *397 those cattle by petitioners. His evidence, too, carries us back only to 1975. Scully maintained cattle for Grdina from 1970 to 1980. Scully's evidence shows that Grdina had about 600 head of cattle by the end of 1972 -- enough to account for the 1972 transfers in question if half of them belonged to Financial rather than Grdina. However, Scully's testimony was that initially the cattle "had some percentage of Charolais blood, but probably less than half." Scully testified that "After 1975, he [Grdina] * * * started buying purebred Charolais cattle". Thus, Scully's testimony does not indicate that in 1972 Financial (or Grdina) had enough cattle with a sufficiently high degree of Charolais blood to account for petitioners' purported purchases. Harrington, a vice-president of the Colman Bank, testified as to loans to Grdina secured by Grdina's interest in cattle. The Colman Bank's security agreements show purchases by Grdina before October 1, 1972, totaling (1) 107 Charolais cows and (2) 1/7th interests in 367 registered Charolais cows, 93 registered Charolais calves, 50 Charolais steer calves, and 10 registered Charolais bulls. (See table 2, supra.) These security agreements all *398 show Grdina, not Financial, as the debtor. Since the Colman Bank's security interest extends to all the livestock of the debtor, [22] *399 we expect that the parties to the loans took pains to be sure that the correct person was identified as the debtor. Harrington's evidence also falls short of showing that in 1972 Grdina owned enough cattle of the king purportedly sold to petitioners in 1972. It suggests, however, that Grdina may have had encumbered property interests in enough such cattle, and opens the possibility that Financial might have acquired Grdina's interests. Petitioners have brought us up to the level of speculating that Financial might have owned what it purported to sell to petitioners; petitioners have failed to convince us that it is more likely than not that Financial owned what it purported to sell. [23] *400 Benefits and Burdens of Ownership
We now consider whether (even if Financial owned the cattle it purported to sell) petitioners bought the cattle they purported to buy. In general, the "incidence of taxation depends upon the substance of a transaction" rather than its mere form. E.g., Commissioner v. Court Holding Co.,324 U.S. 331, 334 (1945); Estate of Schneider v. Commissioner,88 T.C. 906, 938 (1987), on appeal (CA7 Oct. 6, 1987). Whether the substance of a transaction is a sale for Federal tax purposes is a question of fact, determined by reference to all the surrounding facts and circumstances including the form chosen by the parties to *401 the transaction. Frank Lyon Co. v. United States,435 U.S. 561 (1978); Yamamoto v. Commissioner,73 T.C. 946 (1980), affd. without published opinion 672 F.2d 924 (CA9 1982). The overwhelming impression created by the evidence of record in the instant cases is that petitioners and Financial did not act as though petitioners had bought from Financial, and Financial had sold to petitioners, the cattle that purportedly were the subjects of the April 1, 1972, and October 1, 1972, transactions. Each of the April 1, 1972, transaction packages included a document headed "Bill of Sale". Each bill of sale referred to an "Exhibit A attached hereto". Apparently, this is the same "Exhibit A" that was supposed to be attached to the purchase agreements and certain other components of the packages. The parties have stipulated that no such "Exhibit A" was attached, but that the "Exhibit A" was mailed to petitioners 18-19 months later. (See n.1, supra.) Each "Exhibit A" refers to purebred Charolais bulls. When title to purebred Charolais bulls is to be transferred, a pedigree form is to accompany the animal. When the Exhibit A forms were sent to petitioners, on November 28, 1973, the cover letters *402 stated that "the registration papers will * * * follow shortly." Petitioners were never provided with any of these pedigree forms. The October 1, 1972, transaction package did not include a bill of sale. No "Exhibit A" was attached to the purchase agreement and other components of the package. "Exhibit A" was sent to Presto at some indeterminate date. Thus, half of the assertedly purchased cattle were not accompanied by a bill of sale. The other half were accompanied by bills of sale which were missing an essential element, which omission was not supplied for 18-19 months. No registration or pedigrees were provided with regard to the purebred bulls, animals for which a bill of sale is insufficient. Petitioners argue that "The 'Bills of Sale' submitted by [Financial] to Petitioners * * * did * * * transfer legal ownership of the cattle to the Petitioners." We conclude that petitioners were essentially indifferent to receiving the documentation that ordinarily is provided to evidence a transfer of title to cattle. Paragraph 9 of each of the maintenance agreements provides as follows: 9. SALE OF CALVES. [Financial] hereby agrees to purchase all calves born to the Herd at $ 350 *403 per male calf and $ 600 per female calf, the purchase price to be paid at the time a male calf becomes 12 months of age and a female calf becomes 24 months of age. [Emphasis in original.]
Under this schedule, Financial would first buy male calves in 1974 and female calves in 1975, 12 months later. However, each of the program schedules provides for Financial to first buy male calves in 1974 and female calves in 1976, 24 months later. As a result, under the program schedules each of the petitioners was to make a net payment to Financial for 1975 ($ 7,599 in the case of the April 1 agreements and $ 15,548 in the case of the October 1 agreement). See tables 3 and 4, supra.
Under the maintenance agreements, Financial was obligated to buy the first crop of female calves in 1975; that additional payment obligation would have resulted in Financial's being obligated to make substantial net payments to petitioners, instead of the other way around. In fact, as table 1, supra, shows, petitioners paid Financial (see the payments dated April 10, 1975, and October 30, 1975). Thus, petitioners and Financial ignored their apparent obligations under the maintenance contracts (which had been executed *404 by them and by Grdina) and instead followed the program schedules. Each of the maintenance agreements specifies that it "shall continue for a period of seven (7) years." Accordingly, each should end in 1979. (See n.3, supra.) Yet, the program schedules show full schedules of payments through 1980 and payments due on account of female calves through 1982. When petitioners sued Financial, the payments they alleged as being due to them from Financial were those in accordance with the program schedules (through 1981) and not the maintenance agreements (which expired by their own terms in 1979). See n7, supra. Thus, even in bringing suit, petitioners ignored the provisions of their own signed agreements. Each of the maintenance agreements guarantees a minimum of one calf per cow per year. The program schedules show exactly one calf per cow each year. Each of the April 1 program schedules shows 38 male calves and 37 female calves to be born each year; the October 1 program schedule shows 75 male calves and 75 female calves to be born each year. We do not know what nature provided to the cows that were in petitioners' purported herds, but apparently what actually happened was irrelevant. *405 Payments were made, and unpaid amounts were sued for, strictly on the basis of the program schedule and not on the basis of what actually occurred. From this we draw the distinct impression that petitioners and Financial did not have any interest in what actually happened to any cattle. Rather, they had agreed to schedules of payments; those schedules, and not the benefits and burdens of real-world ownership, governed petitioners' and Financial's interests vis-a-vis each other. Petitioners' representatives and Grdina testified that the objective of the program of Charolais blood), in order to make the calves more valuable. However, petitioners never kept records as to the status of their herds. Petitioners' witnesses who testified about maintenance of cattle testified that they did not mark, physically separate, or otherwise record which cattle were part of whose herd. Grdina testified that the upgrading plan was as follows: A. Yes. At the time we went into this program with Prompt and Presto, and when I went into the program in 1970, Charolais cows, [purebred] cows, were selling upwards of $ 15,000.00 each. [Our] theory was that we had started with what [we] call "halfbreeds" *406 or "three-quarter breeds." This would be a combination of a Hereford and a Charolais, or a Black Angus and a Charolais, which would be a halfbreed. Half Charolais and half Angus. Using purebred bulls, we were able to -- the calf, the progeny from that cow would be a three-quarter percentage. And if that was a female cow and we rebred her and two years later she had a calf, that would be a seven-eighths cow. And then two years later, if you had a calf, that would be a fifteen-sixteenths cow. And the terminology with the Charolais breed is, the Association is, that you could then register that fifteen-sixteenths cow as a purebred, registered Charolais. That's what we were working toward.
However, it appears that under the program schedules Financial bought all of the calves from petitioners' herds. [24] *407 Petitioners have not explained how their herds could be upgraded if Financial bought them all the upgraded calves that their herds produced. We conclude that petitioners were indifferent to the quality of the cattle in the herds they purportedly bought. On brief, petitioners present an elaborate construct to show that the 1972 then-present value of what they bought was more than the 1972 then-present value of their payment obligations. Their calculations depend on their showing that the documents they signed as parts of the April 1 and October 1 packages provide for grossly unreasonable interest rates and maintenance expense payment rates. Petitioners' showing of these unreal aspects of the packages serves to convince us even more that the packages were unreal, and that petitioners and Financial never intended that they would be bound by the terms of their purported binding contracts. Petitioners' contentions in this regard help to convince us that the agreements were part of a deliberate effort to create a facade to lend plausibility to their unwarranted claims of tax deductions and credits. [25] *408 Petitioners point to our opinion in Lemmen v. Commissioner,77 T.C. 1326 (1981), which, they contend, involved "a fact pattern extremely similar to the case[s] at hand". Although there are many similarities between Lemmen and the instant cases, there also are critical differences. In Lemmen, the Court concluded that the taxpayer really had bought cattle and then focussed on the question of whether the real transaction was entered into for profit. In the instant cases, petitioners have failed to surmount the first hurdle -- we are persuaded that they did not buy cattle, and that the various agreements they formally executed in 1972 were not intended to have any real-world effect but merely to be parts of a cosmetic cover-up for their claimed tax benefits. Thus, Lemmen is distinguishable. [26] *409 * * * At the trial in these cases, witnesses were excluded from the courtroom, pursuant to Rule 145(a), which is identical to Rule 615, Fed. R. Evid. During the course of the Court's instructions to counsel and the witnesses, petitioners' *410 counsel objected to a part of the Court's instructions, as follows: MR. KLEINMAN: If the Court please, I would object to such a ruling. First of all, as the Court well knows, witnesses can advise an attorney of what their testimony is going to be before -- as of yesterday we were working -- THE COURT: Yes, sir. MR. KLEINMAN: -- and suppose, Your Honor, that the witness says something that comes out different from what the attorney has anticipated, and he's expecting another witness to give testimony which may conflict. Is it suggested that I could not tell the second witness that the first witness said something different from what you said, you better think about it? THE COURT: Yes. MR. KLEINMAN: I can't say that? THE COURT: Correct. You can't say that. That's the function of excluding the witness. Because if you were permitted to say that, then there's no difference between that and the other witness being in the courtroom and hearing the prior witness giving that testimony. MR. KLEINMAN: As I understand the rule, the purpose is to keep the witness -- one witness from hearing the testimony of the other. If the Court rules otherwise, I would raise an objection to that procedure, *411 Your Honor. I think it adversely affects my right to deal with my witnesses as I see fit. THE COURT: I am ruling otherwise, and your objection is noted. And obviously, if this does end up going to decision and is appealed, this will be one of the things that you will have a right to present to the Court of Appeals. On reflection, the Court concludes that the ruling at the trial is correct. Pursuant to Rule 145(a)(2) (and Rule 615(2), Fed. R. Evid.), the corporate petitioners designated representatives were permitted to remain in the courtroom throughout the proceedings and their opportunity to confer with their counsel was not restricted. As to the other witnesses, however, we agree with the view expressed by Professors Saltzburg and Redden, as follows: Our view, as expressed in the Editorial Comment, supra, is that Rule 615 offers but slight protection if counsel can convey to prospective witnesses substantially verbatim accounts of courtroom testimony.
S. Saltzburg and K. Redden, Federal Rules of Evidence Manual, at 615 (4th ed. 1986).
Conclusion
We conclude that petitioners never acquired the benefits and burdens of ownership of cattle they purportedly purchased. Since the *412 benefits and burdens of ownership of the cattle were not transferred, no purchase occurred for tax purposes. Cherin v. Commissioner,89 T.C. at 999. Since petitioners never bought the cattle, petitioners are not entitled to the deductions they claim from cattle breeding operations nor are they entitled to the investment credits. We hold for respondent. Decisions will be entered under Rule 155.
[27]
Footnotes
1. Each purchase agreement recites that the cattle referred to in the agreement are set forth in an "Exhibit A" and that this Exhibit A is attached and made a part of the agreement. The Exhibit A was not attached to either of the purchase agreements nor to the related security agreements, bills of sale, and maintenance agreements, at the time of their execution. The "Exhibit A" attachments were mailed to petitioners on November 28, 1973. The Exhibit A sent to Prompt describes the cattle referred to in the purchase agreement as follows: 75 Charolais Cows
Percentage of
Tag Number          Charolais Breed
Age
PTA 72           1/2
3
1-15            PTA 72           1/2
2
16-30           PTA 72           3/4
2
31-45           PTA 72           3/4
2
46-60           PTA 72           7/8
2
61-75           1-1/2 Charolais Bulls     PTA 72           100
2
1             PTA 72           100
2
2 (1/2 ownership)             A letter accompanying the Exhibit A states, in relevant part as follows: To briefly describe the numbering system used as a continuing record over a period of years: PT identifies Prompt Foods, A designates first breeding, 72 shows the year in which the program was started, and the numbers 1 through 75 represent the number of cows. As additional information relative to your cattle program developes, the enclosed information will be up-dated. Since the bulls in the program are purebred and registered, the registration papers will also be part of your program and will follow shortly. The Exhibit A sent to Presto is identical to that sent to Prompt, except for the use of "PF" for Presto, in lieu of "PT" for Prompt. (The last bull, PTA 72-2, is also shown as PTA 72-2 on the Presto Exhibit A.) ↩
2. The notes provides as follows: It is covenanted and agreed that notwithstanding any provision to the contrary contained in this Note, in the Security Agreement, or in the aforesaid Purchase Agreement, the holder hereof shall look exclusively to the Collateral for the payment of this Note and any judgment entered hereon or recovery hereunder or under the Security Agreement is limited to the Collateral and no deficiency or other personal judgment or any order or decree of specific performance shall be rendered against the maker hereof in any action or proceeding brought on this Note or the Security Agreement. 3. Although the contract paragraph is titled "Term and Extension", the text of the contract paragraph does not provide for any extension. ↩
4. The "Exhibit A" sent to Presto described the cattle referred to in the October 1, 1972, purchase agreement as follows: ↩
150 Charolais Cows
Percentage of
Tag Number     Charolais Breed
Age
PFA 72      1/2  2
76-115      PFA 72      3/4  2
116-155      PFA 72      3/4  3
156-195      PFA 72      7/8  2
196-225      3 Charolais Bulls
PFA 72      7/8  3
3-4       PFA 72      15/16
2
5       5. Generally in North and South Dakota west of the Missouri River, cattle are kept on open range land; the cattle there are branded or tattooed in order to separate one owner's cattle from another owner's cattle. Generally in the eastern parts of these States, cattle are kept on farms or ranches and only one owner's cattle are on a given farm or ranch at one time; in that part of the country, cattle generally are not branded or tattooed. ↩
6. In early 1974, 1975, and 1976, Scully filed South Dakota personal property tax returns on Grdina's behalf showing that Grdina owned 114 cattle, 166 cattle, and 146 cattle, respectively. The record does not disclose whether Scully also filed such tax returns on behalf of Financial, or whether anyone else filed such tax returns on behalf of Grdina or Financial. *. At this point, there would still be a balance due of $ 102,784. ↩
*. At this point there would still be a balance due of $ 205,567. ↩
7. The complaint filed by petitioners alleged damages based on unpaid amounts due to petitioners from Financial as follows: Count I - Unpaid amounts due to Prompt:
October 15, 1977          $ 32,920
October 15, 1978          34,500
October 15, 1979          35,980
October 15, 1980          37,381
October 15, 1981          45,000
Total           $ 185,781
Count II - Unpaid amounts due to Presto:
April 30, 1977          $ 16,335
April 30, 1979          17,868
April 30, 1980          18,565
April 30, 1981          22,200
Total            * $ 74,758
Count III - Unpaid amounts due to Prompt:
April 30, 1977          $ 16,335
April 30, 1979          17,868
April 30, 1980          18,565
April 30, 1981          22,200
Total            * $ 74,758
Total all three counts           * $ 335,297
* The sum of the separate annual amounts in count II and count III is $ 74,968, and the sum of the separate annual amounts in all three counts is $ 335,717. Nonetheless, petitioners alleged that a total of only $ 74,758 was due to them in counts II and III, and only $ 335,297 altogether. The discrepancies are not discussed by the parties. 8. Although the principal amounts of the nonrecourse promissory notes are as listed, payments of $ 6,500, $ 6,500, and $ 13,000 respectively, were due on these notes on the dates of the purported purchases. These amounts were then "paid" by recourse promissory notes. Consequently, only the balances ($ 158,500, $ 158,500, and $ 317,000) were financed under the nonrecourse promissory notes. 9. These interest deductions are those claimed by petitioners with regard to the nonrecourse promissory notes, and not with regard to the recourse promissory notes. See n.27, infra.↩
10. Under sec. 6512(b)(1), if the Tax Court has jurisdiction of a case because respondent has determined a deficiency, then the Tax Court may determine that there is an overpayment. However, the Tax Court does not have jurisdiction to determine that there is an overpayment as to a year, even though the notice of deficiency includes adjustments as to that year, unless respondent has first determined there is a deficiency for that year. Martz v. Commissioner,77 T.C. 749 (1981). Accordingly, we cannot determine an overpayment for Prompt for 1976. Nevertheless, sec. 6214(b) gives us jurisdiction to consider the facts with relation to 1976 to the extent that it is necessary to do so in order to reexamine the deficiencies that are in dispute as to the other years. See sec. 136 of S. 2223, the Omnibus Taxpayer Bill of Rights, which would permit petitioners to sue for refunds in this Court and so would facilitate consistent treatment and avoid significant increases in their costs of litigation. S. 2223 was reported favorably by the Senate Finance Committee on March 29, 1988. The Committee's report is S. Rept. 100-309. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue. ↩
11. Although respondent determined that Presto had overstated its taxable income for 1978 by $ 5,961, respondent nonetheless determined that Presto had a deficiency for 1978. Presto reported, in 1978, $ 44,700 of long-term capital gain from the sale of "75 Female Charolais Cattle." Against this, Presto offset a long-term capital loss from an unrelated transaction. Presto applied the 30-percent alternative tax rate to the net long-term capital gain of $ 42,787. Although respondent's adjustment resulted in a lesser taxable income, respondent did not use the alternative tax rate since there was no net long-term capital gain under respondent's determination. Thus, under respondent's determination, the lesser amount of taxable income was subject to a greater marginal tax rate (48 percent). In the instant case, the greater rate, applied to the lesser taxable income, produces a greater tax (hence, a deficiency) than the lesser rate, applied to the greater taxable income. ↩
12. SEC. 61. GROSS INCOME DEFINED. (a) General Definition. -- Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: * * * (2) Gross income derived from business; ↩
13. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * * ↩
14. SEC. 167. DEPRECIATION. (a) General Rule. -- There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) -- (1) of property used in the trade or business * * * ↩
15. The investment credit was generally repealed for property placed in service after December 31, 1985, by sec. 211(a) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2166). 16. Ramirez v. Commissioner,T.C. Memo. 1982-608↩.
17. See, e.g., Wheeler v. Commissioner,T.C. Memo. 1983-385↩. 18. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure.
19. As used herein, "quality" of cattle refers to characteristics possessed by cattle that affect their value -- in particular, percentage of Charolais blood. ↩
20. That is, five bulls and two 1/2 interests in one other bull. ↩
21. That is, two bulls and two 1/2 interests in one other bull. ↩
22. Grdina's cattle were subject to a security interest held by the Colman Bank. Because of an "after-acquired" clause in the security agreements executed by Grdina or his agent, all cattle acquired after the granting of the initial security interest also were subject to the Colman Bank security interest. S.D. Codified Laws Ann. sec. 57A-9-302(2) (1980) and N.D. Cent. Code sec. 41-09-27(2)(1983) both provide, in identical language, as follows: Except where this chapter otherwise provides, [*] a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor. * Chapter 57A, S.D. Codified Laws Ann. and Chapter 41-09, N.D. Cent. Code are both titled, and deal with Secured Transactions - Sales of Accounts, Contract Rights and Chattel Paper.
Accordingly, the Colman Bank's security interest in any cattle held by Grdina would continue in any cattle transferred by Grdina to Financial. See In re Kittyhawk Television Corp.,516 F.2d 24 (CA6 1975, applying Ohio law); Ryan v. Rolland,434 F.2d 353 (CA10 1970, applying New Mexico law). See also Tinney, "Effectiveness of Original Financing Statement Under UCC Article 9 After Change in Debtor's Name, Identity, or Business Structure", sec. 4, 99 ALR 3d 1194, 1206↩ (1980, supplemented to 1987). 23. Grdina testified that he had been in a cattle partnership with Scully and five others and that he bought out Scully and the five others in 1972. He testified that the cattle that the partnership had owned were the ones on Scully's farm. Table 2, supra,↩ and the text following it, show that Grdina was doing partnership borrowing from the Colman Bank as late as December 31, 1972. The later borrowing from the Colman Bank shown on table 2 was by Grdina as an individual. Thus, petitioners' evidence shows cattle owned by a partnership and by Grdina as an individual but does not show cattle owned by Financial, the purported seller of the cattle to petitioners.
24. Under the Amendment to Maintenance Contract, each petitioner had the option to repurchase calves. Neither petitioner has suggested that any calves were repurchased or that any attempt was made to repurchase any calf. 25. In Gilbert and Sullivan's "Mikado", Pooh-Bah put it thusly: Merely corroborative detail, intended to give artistic verisimilitude to an otherwise bald and unconvincing narrative.
We respond, with Pitti-Sing -- Corroborative detail indeed! Corroborative fiddlestick!
"The Mikado", The Complete Plays of Gilbert and Sullivan, p. 390, (New York: Modern Library). ↩
26. On brief, both petitioners and respondent address several factors this Court has used to determine when the benefits and burdens of ownership have transferred as part of a purported sale. See Cherin v. Commissioner,89 T.C. 986, 997 (1987); Houchins v. Commissioner,79 T.C. 570, 591 (1982); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237-1238 (1981); Estate of Franklin v. Commissioner,64 T.C. 752, 763-770 (1975), affd. on other grounds 554 F.2d 1045 (CA9 1976); Harmston v. Commissioner,61 T.C. 216, 228-231 (1973), affd. 528 F.2d 55 (CA9 1976). As often happens, the tax consequences in the instant case turn on what was actually done rather than what might have been done. Had petitioners acted in conformance with the agreements (which appear to be legally enforceable contracts), perhaps their activities would have qualified them for the tax results flowing from such activity. However, the parties to the agreements chose instead to ignore the agreements and acted instead wholly in conformity with the program schedules. This Court will not, in its analysis, pretend that the agreements reflect the understanding of the parties thereto when such parties chose to ignore the agreements in their dealings with each other. ↩
27. Generally, interest paid on genuine recourse indebtedness, even if paid as part of a sham transaction, will give rise to an interest deduction under section 163. See Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 96 (CA4 1985), revg. on this issue 81 T.C. 184 (1983); Rose v. Commissioner,88 T.C. 386, 423 (1987), on appeal (CA6 Dec. 14, 1987). Table 1, supra, shows payments somewhat in excess of those required by the program schedules. These excess amounts may have been interest on the recourse promissory notes. The parties are to resolve this matter in the computations under Rule 155, Tax Court Rules of Practice & Procedure.↩